CHARLES CLARKE & CO. v. MANNHEIM INS. CO. (No. 2583.)

(Commission of Appeals of Texas, Section B. April 2, 1919.)

1. INSURANCE ⬥403—"PERIL OF THE SEA."

Generally, any loss or injury is occasioned by a peril of the sea which has for its proximate cause the fortuitous action of the sea, operating either singly or in conjunction with other elements or causes, or is peculiar to transportation by vessels supported by the sea or its buoyancy.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Perils of the Sea.]

2. INSURANCE ⬥403—"PERIL OF THE SEA."

Loss or damage occasioned by natural deterioration or decay, or by ordinary wear and tear of the vessel, are not within the term "perils of the sea."

3. INSURANCE ⬥415—UNSEAWORTHINESS.

Any loss proximately caused by unseaworthiness of the vessel at the time of leaving port is not a loss by peril of the sea.

4. INSURANCE ⬥403—"PERIL OF THE SEA."

Where the loss or damage is from causes independent of the sea or its action, or is not peculiar to navigation, it is not by a peril of the sea; in other words, the peril must be one "of the sea," and not merely one occurring "on the sea."

5. INSURANCE ⬥413—MARINE INSURANCE—PROXIMATE CAUSE OF LOSS.

The co-operation of other causes will not prevent the loss or damage from being one by perils of the sea.

6. INSURANCE ⬥416—NEGLIGENCE OF OWNER OR AGENT.

A loss or damage is not prevented from being one by perils of the sea by the co-operation of such other causes as acts or omissions of the owner or his agent amounting to negligence, but not amounting to fraud or design.

7. INSURANCE ⬥416—MARINE INSURANCE—NEGLIGENCE OF OWNER OR AGENT.

The protection of marine insurance embraces, in the absence of a contrary stipulation, losses arising from negligence of the owner or his agent, if contributed to by a peril insured against.

8. INSURANCE ⬥416—MARINE INSURANCE—NEGLIGENCE OF CREW.

Where a vessel listed and sank while in harbor because a watchman neglected to close a sea cock opened to take in water for use in boilers, the accident was one of the perils of the sea, and a marine insurance company was liable under its policy for the expense of raising and repairing the vessel.

Error to Court of Civil Appeals of First Supreme Judicial District.

Action by Charles Clarke, doing business under the name of Charles Clarke & Co., against the Mannheim Insurance Company. Judgment was rendered for plaintiff, which was reversed and rendered for defendant by the Court of Appeals, 157 S. W. 291, and the plaintiff brings error. Judgment of the Court of Civil Appeals reversed, and judgment of the trial court affirmed.

James B. & Charles J. Stubbs, of Galveston, for plaintiff in error.

Wm. B. Lockhart and W. T. Armstrong, both of Galveston, for defendant in error.

McCLENDON, J. The plaintiff, Charles Clarke, doing business under the name of Charles Clarke & Co., brought this suit against the defendant, Mannheim Insurance Company, upon a policy of marine insurance assuring the plaintiff against all damage, etc., during the life of the policy, occasioned to "the good tug called Seminole," while in "the Gulf waters of the United States between Key West, Florida, and the mouth of the Rio Grande Del Norto, both inclusive," "against the adventures and perils of the harbors, bays, sounds, seas, rivers and other waters as above named." The plaintiff recovered in the trial court, but this judgment was reversed and rendered by a majority of the Court of Civil Appeals (157 S. W. 291), that court holding that the damages sought to be recovered were not within the risk covered by the policy, in that they were not occasioned by "adventures and perils of the harbors, bays, sounds, seas, rivers and other waters." The main question for our determination and the one upon which writ of error was granted, is the correctness of this holding of the Court of Civil Appeals.

The theory upon which plaintiff sought recovery and upon which the jury were warranted, under the charge of the court, in returning a verdict for plaintiff, was that the loss to the vessel was occasioned in the following manner: The tug Seminole was engaged generally in towing barges loaded with ties between various Gulf ports. At the time of the accident complained of she was lightering lumber from Morgan City, La., which is a port situated 18 miles north of the mouth of the Atchafalaya river, to a schooner anchored in the Gulf some 40 miles

distant from Morgan City. About 10:30 p. m. on the night of January 13, 1910, the tug arrived at Morgan City and tied up for the night alongside another boat, the Alarm. The latter was a stern wheeler, some 97 feet in length, and was moored against Market wharf, headed up stream. The Seminole was moored against the Alarm, headed down stream; its port side towards the port side of the Alarm. It was made fast to the Alarm by three ties or ropes.

While the evidence is not free from conflict, it is sufficient, we think, to warrant the conclusion that the free board of the Alarm was lower than the free board of the Seminole at the points of contact between the two vessels so that the deck or guard rail of the latter projected over the deck of the former. The Seminole was due to leave the port at 3 o'clock the following morning. The Seminole had originally been a coal burner, its bunkers being located on each side of the vessel, but later the vessel was converted into an oil burner, and these bunkers were converted into fresh water tanks for the purpose of supplying the boiler of the engine. These tanks were each about 18 feet long, with a mean width of 4½ feet, and extended from the bottom of the vessel up to the under side of the deck. The hull of the vessel formed the outer side of each tank. The height of the tanks was approximately 7 feet. These tanks were filled by means of a sea cock extending through the bottom of the tug, with cut-offs so arranged that either or both of the tanks could be filled by a gravity flow from the outside. About 11:30 p. m. on the night in question orders were given to fill the port tank. It was the custom to fill this tank first, on account of the fact that the machinery of the vessel was so placed that more weight was thrown to starboard. It was also in evidence that the starboard tank already had some water in it, but the port tank was empty. The orders were to fill the port tank to the same capacity as that of the starboard, and then to cut off the water entirely. At 12 o'clock midnight all the crew retired except one Taylor, who was left on duty as watchman, and who was instructed to close the sea cock when enough water had been admitted to the port tank. Shortly after 12 o'clock Taylor lay down with his head on a steam pipe, smoking a cigarette, and soon went to sleep. Later he waked up, lighted another cigarette, and again went to sleep. About 2 o'clock a. m. the crew were awakened by a sudden list of the Seminole to port, and upon awaking they found the water was rushing into the hold of the vessel over the port guard rail. The crew had barely sufficient time to get off of the Seminole onto the Alarm before the vessel sank, stern first, in 60 feet of water. The vessel was afterwards raised, and the damage claimed is the cost of raising and repair.

210 S.W.—34

Plaintiff's theory was that the flow of the water into the port tank caused the vessel to list until its port guard rail rested and became hung on the deck of the Alarm; that the water continued to flow into the port tank until the weight on the port side became so great that the list of both vessels caused the Seminole to slide off of the Alarm with a sudden plunge, the momentum of which submerged the port guard rail and caused the water to flow over the port side of the vessel and thereby sink it. The evidence, we think, is sufficient to sustain this contention. The majority of the Court of Civil Appeals held that under this state of facts the injury to the vessel was not caused by an adventure or peril of the sea, but from the negligence of the watchman in going to sleep with the sea cock open admitting water into the port tank.

[1-6] The question here presented, namely, whether the loss occasioned to the tug came within the meaning of the terms of the policy, as being from a peril of the sea, is not free from difficulty. The courts of America and England have frequently had to consider what is a peril of the sea, as that term is used both in policies of marine insurance and in bills of lading and charter parties. But to quote from a well-considered note in Annotated Cases:

"Compared with the large number of cases in which the question has arisen whether a particular loss was caused by a peril of the sea, within the meaning of a policy of marine insurance, but few attempts have been made to define the term 'perils of the sea' as used in this connection. It is undoubtedly true that the purpose of the policy of insurance against the perils of the sea is protection against contingencies and against possible dangers, and such a policy does not cover a loss for injury which must inevitably take place in the ordinary course of things." Ann. Cas. 1912D, 1038.

Without presuming to lay down any general definition of the term "peril of the sea," as applied to all circumstances that may arise, we think the following general principles may be deduced from the various decisions upon the subject: Any loss or injury is occasioned by a peril of the sea which has for its proximate cause the fortuitous action of the sea, operating either singly or in conjunction with other elements or causes, or is peculiar to transportation by vessels supported by the sea or its buoyancy, subject to the following well-defined limitations:

(1) Loss or damage occasioned by natural deterioration or decay, or by ordinary wear and tear of the vessel, are not within the term "perils of the sea."

(2) Whether expressed in the contract of insurance or carriage or not, there is an implied warranty that the vessel is seaworthy; that is, that she is so constructed, manned, supplied, equipped, and in such condition of repair as to be able reasonably to perform the service in

which she is engaged; from which it follows that any loss proximately caused by unseaworthiness of the vessel at the time of leaving port is not a loss by peril of the sea.

(3) As a corollary to the general statement above, where the loss or damage is from causes independent of the sea or its action, or is not peculiar to navigation, it is not by a peril of the sea; in other words the peril must be one "of the sea" and not merely one occurring "on the sea."

(4) The co-operation of other causes will not prevent the loss or damage from being one by perils of the sea; and this is true even where the contributing causes are acts or omissions of the owner or his agent amounting to negligence, but not amounting to fraud or design.

[7] These general principles are applied without distinction both to policies of marine insurance and to contracts of carriage, with the exception that a common carrier by water, equally with other common carriers, cannot, at least under the American decisions, contract against liability for its own or its agent's negligence, and when such negligence is a contributing cause of the loss or damage, liability is not defeated even though a peril of the sea is also a contributing cause. On the other hand, protection of marine insurance embraces, in the absence of a contrary stipulation, losses arising from such negligence, if contributed to by a peril insured against. Our investigation discloses that when the loss may be fairly attributable to a peril of the sea as one of its contributing causes, the authorities are uniform that negligence of the owner or his agent is not a proper subject of inquiry.

[8] In the leading case of Waters v. Insurance Co., 11 Pet. 213, 9 L. Ed. 691, which was decided by the Supreme Court of the United States in 1837, Judge Story, speaking for the court, quotes from Lord Tentorden in Walker v. Maitland, 5 Barn. & Ald. 174:

"No decision * * * can be cited, wherein such a case [the loss by a peril of the sea], the underwriters had been held to be excused in consequence of the loss having been remotely occasioned by the negligence of the crew. I am afraid of laying down any such a rule. It will introduce an infinite number of questions, as to the quantum of care, which, if used, might have prevented the loss. Suppose, for instance, the master were to send a man to the masthead to look out, and he falls asleep, in consequence of which the vessel runs upon a rock, or is taken by the enemy; in that case it might be argued, as here, that the loss was imputable to the negligence of one of the crew, and that the underwriters are not liable. Those, and a variety of other such questions would be introduced, in case our opinion were in favor of the underwriters."

Commenting upon this quotation, Judge Story said:

"His lordship might have stated the argument from inconvenience, even in a more general form. If negligence of the master or crew were under such circumstances a good defense, it would be perfectly competent and proper to examine on the trial any single transaction of the whole voyage, and every incident of the navigation of the whole voyage, whether there was due diligence in all respects, in hoisting or taking in sail, in steering the course, in trimming the ship, in selecting the route, in stopping in port, in hastening or retarding the operations of the voyage; for all these might be remotely connected with the loss. If there had been more diligence, or less negligence, the peril might have been avoided or escaped, or never encountered at all. Under such circumstances, the chance of a recovery upon a policy for any loss, from any peril insured against, would of itself be a result of no inconsiderable hazard."

The following decisions are illustrative of the principles we have set forth above:

In the case of Orient Ins. Co. v. Adams, 123 U. S. 67, 8 Sup. Ct. 68, 31 L. Ed. 63, which was a suit upon a marine policy of insurance insuring against the perils of the sea, lakes, rivers, canals, etc., the facts were that a boat, operating on the Ohio river, drifted over a fall and was stranded. During the course of the voyage a part of the machinery of the vessel had become deranged, and it put into Louisville for repairs. In order to make the repairs, it was necessary to blow off the steam from the boiler. On leaving the dock, the master negligently failed to ascertain that there was a sufficient head of steam to navigate the vessel and gave the signal to let go the boat. It was shown that this order was given in direct violation of a custom that before giving the order the master should inquire of the engineer as to the condition of the steam, and await his reply before giving the order to let go. The vessel was then in a position to be carried over the fall by the current, if she was let go without sufficient steam, which she did not have. The loss of the vessel by being carried over the fall, under these circumstances, was held to be a peril insured against. The trial court instructed the jury that the mere fault or negligence of the captain of the vessel, by which it was drifted into the current and drawn over the fall, would not constitute a defense to the policy, unless the jury should be satisfied that the captain acted fraudulently or willfully with design in doing so. This charge was complained of, but it was held to correctly state the law. In so holding the court say:

"The court proceeded upon the ground that, if the efficient, and therefore proximate, cause of loss was a peril of the river, the company could not escape liability by showing that the loss was remotely caused by mere negligence in not ascertaining, before giving the signal to let the vessel go, that she had steam enough for her proper management. The court committed no error in so ruling."

In arriving at this conclusion, the court quote with approval from Insurance Co.

v. Lawrence, 35 U. S. (10 Pet.) 517, 9 L. Ed. 512, as follows:

"A loss by fire, occasioned by the mere fault and negligence of the assured, or his servants or agents, and without fraud or design, is a loss within the policy, upon the general ground that the fire is the proximate cause of the loss, and also upon the ground that the express exceptions in policies against fire leaves this within the scope of the general terms of such policy."

The following is also quoted with approval from Waters v. Insurance Co., 11 Pet. 224, 9 L. Ed. 691, which quotation relates to the former decision in Insurance Co. v. Lawrence:

"The court then thought that in marine policies, whether containing the risk of barratry or not, a loss whose proximate cause was a peril insured against, is within the protection of the policy, notwithstanding it might have been occasioned remotely by the negligence of the master and mariners."

Again in the case of Steamship Co. v. Insurance Co., 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788, the same court held that stranding of a vessel caused by negligence of the master, in not taking proper bearings or any bearings at all, was by a peril of the sea, as that term is used in a policy of marine insurance. In that case there is no question but that the negligence of the master was the direct, proximate, and immediate cause of the stranding, as those terms are generally understood in negligence cases. We quote the following from the decision in that case:

"Collision or stranding is, doubtless, a peril of the seas; and a policy of insurance against perils of the sea covers a loss by stranding or collision, although arising from the negligence of the master or crew, because the insurer assumes to indemnify the assured against losses from particular perils, and the assured does not warrant that his servants shall use due care to avoid them. General Ins. Co. v. Sherwood, 14 How. [55 U. S.] 351, 364, 365 [14 L. Ed. 452]; Orient Ins. Co. v. Adams, 123 U. S. 67, 73 [8 Sup. Ct. 68, 31 L. Ed. 63, 66]; Copeland v. New England Ins. Co., 2 Met. 432, 448–450. But the ordinary contract of a carrier does involve an obligation on his part to use due care and skill in navigating the vessel and carrying the goods; and, as is everywhere held, an exception, in the bill of lading, of perils of the sea or other specified perils does not excuse him from that obligation, or exempt him from liability for loss or damage from one of these perils, to which the negligence of himself or his servants has contributed. New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 344 [12 L. Ed. 465]; U. S. Exp. Co. v. Kountze, 8 Wall. [73 U. S.] 341 [19 L. Ed. 457]; Western Transp. Co. v. Downer, 11 Wall. [78 U. S.] 129 [20 L. Ed. 160]; Grill v. General Iron Screw Collier Co.. L. R. 1 C. P. 600, and L. R. 3 C. P. 476; The Zantho [L. R.] 12 App. Cas. 503, 510, 515."

In Steamship Co. v. Bennett, 207 Fed. 510, 125 C. C. A. 172, it was held that where a lighter, which was being towed by a gasoline engine, struck on the banks of a creek, although this was caused by the negligence of the crew towing the boat, the loss came within the risk in a policy insuring against perils of the sea, etc.

In Steamship Co. v. Insurance Co., 204 Fed. 255, 122 C. C. A. 523, the vessel became unmanageable by reason of the stripping of the blades of its propeller, which rendered the vessel unmanageable and occasioned the loss for which recovery was sought. The cause of the breaking of the propeller appears to have been unknown, but it was shown that some of the blades of the propeller had broken before arriving at a certain port where repairs might have been made, and the stripping of the remaining blades was no doubt due to this failure to repair the other blades, and was no doubt negligence on the part of the master of the vessel. The loss occasioned was held to be a peril of the sea, and in so holding the court say:

"It is the object of insurance to protect owners, among other things, against the negligence of their servants."

Insurance Co. v. Monarch, 99 Ky. 578, 36 S. W. 563, was decided by the Court of Appeals of Kentucky in 1896. In that case a vessel employed in river navigation sank from causes entirely unknown and unexplained, yet the evidence introduced tended strongly to show that the captain was negligent. It was there held that the sinking of the vessel was a peril of the river, and that negligence of the master or crew constituted no defense.

In Insurance Co. v. Packet Co., 69 Miss. 208, 13 South. 254, 30 Am. St. Rep. 537, which was a suit upon a policy of marine insurance, insuring against perils of rivers, etc., the loss was occasioned to part of a cargo of cotton which fell into the river under the following circumstances: In the course of the transportation, the cargo had to be transferred from one boat to another. In the process of unloading the cotton was entirely removed from one side of the boat, leaving the other side so heavily laden that the vessel suddenly listed, throwing the cotton into the river. It was held that:

"The injury to the cotton by water of the river, into which it was thrown by a mishap to the boat, was a peril of the river within the terms of the policy; and, if it be true that the careening of the boat resulted from negligence in unloading, the insurer is liable. * * * The immediate cause of injury to the cotton was water of the river. That it got into the river because of some carelessness or unskillfulness of those engaged in unloading does not relieve the insurer from liability. To relieve from liability because of the acts of the master or crew, there must be want of good faith and honesty of purpose. * * * On this subject there is no difference between marine and other

insurance. Whatever diversity of view on this question once existed, it is now firmly settled in England and America, as stated above. 'Where a peril of the sea is the proximate cause of a loss, the negligence which caused that peril is not inquired into.' "

The case of Hamilton v. Pandorf, which may be considered one of the leading cases, at least in England, upon the question at issue, involved the construction of a bill of lading covering a cargo of rice, which exempted the shipper from loss occasioned by perils of the sea. The rice was damaged by sea water flowing by gravity into the boat through holes eaten by rats in a lead pipe connecting a bathtub with the sea. There was no negligence on the part of the carrier. In the trial court, it was held that the loss was occasioned by a peril of the sea, and came within the excepted risk. 16 L. R. Q. B. D. 629. On appeal to the Appellate Division, this decision was reversed. 17 L. R. Q. B. D. 670. The House of Lords, however, reversed the latter decision and affirmed the judgment of the trial court. 12 L. R. App. Cas. 518.

It was urged in that case and it was held by the Court of Appeals that the damage by sea water was not to be considered a cause at all, but merely an effect produced by the gnawing of the hole in the pipe by the rats. To quote the exact language of the learned Master of the Rolls:

"If rats gnaw through a pipe and let the water in, nevertheless, as the rats are the cause, and the sea is not, and the letting in of the sea water is only an effect of the cause, the real effective cause being the rats, what the rats do is not damage caused by perils of the sea. I think, myself, the cases would make it doubtful, even in a policy of insurance, whether it ought not to be held that where rats gnaw through the planks of the ship, the act is so closely immediate that the coming in of the sea water should be treated not as a cause at all, but as an effect, so that even in that case there would be causa proxima as well as causa causans; but this is a matter which we need not determine on the present occasion, and which must remain open until the point is raised."

In reversing this decision the Lord Chancellor says:

"One of the dangers which both parties to the contract would have in their mind would, I think, be the possibility of the water from the sea getting into the vessel, upon which the vessel was to sail in accomplishing her voyage, it would not necessarily be by a storm, the parties have not so limited the language of the contract; it might be by striking on a rock or by excessive heat so as to open some of the upper timbers; these and many more contingencies that might be suggested would let the sea in, but what the parties, I think, contemplated was that any accident (not wear and tear, or natural decay) should do damage by letting the sea into the vessel, that that should be one of the things contemplated by the contract. A subtle analysis of all the events which led up to and in that sense caused a thing may doubtless remove the first link in the chain so far that neither the law nor the ordinary business of mankind can permit it to be treated as a cause affecting the legal rights of the parties to a suit. In this case, the existence of the rats on board, their thirst, the hardness of their teeth, the law of gravitation, which caused the water to descend upon the rice, the ship being afloat, the pipe being lead, and its capacity of being gnawed, each of these may be represented as the cause of the water entering; but I do not assent to the view that this contract can have a different meaning attached to it according as you regard each step in a chain of events as the origin out of which the damage ultimately arose."

"One ought, if it is possible, to give effect to all the words that the parties have used to express what this bargain is, and I think in this case it was a danger, accident, or peril, in the contemplation of both parties, that the sea might get in and spoil the rice. I cannot think it was less such a peril or accident, because the hole through which the sea came was made by vermin from within the vessel, and not by a swordfish from without, the sea water did get in."

In a concurring opinion, Lord Watson says:

"If the respondents were preferring a claim under a contract of marine insurance, expressed in ordinary terms, I should be clearly of opinion, that they were entitled to recover, on the ground that their loss was occasioned by a peril of the sea within the meaning of the contract. When a cargo of rice is directly injured by rats, or by the crew of the vessel, the sea has no share in producing the damage, which in that case is wholly due to a risk not peculiar to the sea, but incidental to the keeping of that class of goods, whether on shore or on board of a voyaging ship. But in the case where rats make a hole, or where one of the crew leaves a porthole open, through which the sea enters and injures the cargo, the sea is the immediate cause of mischief, and it would afford no answer to the claim of the insured to say that, had ordinary precaution been taken to keep down vermin, or had careful hands been employed, the sea would not have been admitted, and there would have been no consequent damage."

In this connection it might be added that in a very early case in Pennsylvania it was held that damage from leaks caused by rats gnawing through the side of a wooden vessel was by a peril of the sea. Garrigues v. Coxe, 1 Bin. (Pa.) 592, 2 Am. Dec. 493.

The case which furnishes perhaps the strongest support for the contention of the insurer in the present case is that of the G. R. Booth, decided by the Supreme Court of the United States in 1898. 171 U. S. 450, 19 Sup. Ct. 9, 43 L. Ed. 234. In that case the plaintiffs sued upon a bill of lading covering a shipment of sugar destined to New York. The vessel was iron, and a part of

the cargo consisted of detonators or blastings caps. The undisputed evidence showed that these detonators were so constructed and packed as to render them immune from explosion when handled as ordinary freight. After the vessel was docked at the wharf in New York, and while discharging its cargo, one of these cases of detonators exploded from some cause unknown, tore a hole in the side of the vessel, thereby immediately admitting sea water which came in contact with the sugar and produced the damage. The bill of lading exempted the carrier from loss occasioned by perils of the sea. It was conceded that there was no negligence on the part of the carrier, and the question arose whether the loss was within the excepted risk. It was held not to be. The following quotation embraces the ground upon which the court rest this holding:

"The explosion, in consequence of which, and through the hole made by which, the water immediately entered the ship, must be considered as the predominant, the efficient, the proximate, the responsible, cause of the damage to the sugar, according to each of the tests laid down in the judgments of this court, above referred to. The damage to the sugar was an effect which proceeded inevitably, and of absolute necessity, from the explosion, and must therefore be ascribed to that cause. The explosion concurred, as the efficient agent, with the water, at the instant when the water entered the ship. The inflow of the water, seeking a level by the mere force of gravitation, was not a new and independent cause, but was a necessary and instantaneous result and effect of the bursting open of the ship's side by the explosion. There being two concurrent causes of the damage—the explosion of the detonators and the inflow of the water—without any appreciable interval of time, or any possibility of distinguishing the amount of damage done by each, the explosion, as the cause which set the water in motion, and gave it its sufficiency for harm at the time of the disaster, must be regarded as the predominant cause. It was the primary and efficient cause, the one that necessarily set the force of the water in operation; it was the superior or controlling agency, of which the water was the incident or instrument. The inflow of the sea water was not an intermediate cause, disconnected from the primary cause, and self-operating; it was not a new and independent cause of damage; but, on the contrary, it was an incident, a necessary incident and consequence of * * * events brought into being by the explosion—events so linked together as to form one continuous whole."

The court refer to the decision in Hamilton v. Pandorf, above, and hold that the two cases are distinguishable:

"There is nothing in the report of any stage of that case to show that the sea water entered the ship immediately upon the gnawing by the rats of the hole in the pipe; and any such inference would be inconsistent with one of the opinions delivered in the House of Lords, in which Lord Fitzgerald said: 'The remote cause was in a certain sense the action of the rats on the lead pipe; but the immediate cause of the damage was the irruption of sea water from time to time through the injured pipe, caused by the rolling of the ship as she proceeded on her voyage.' [L. R.] 12 App. Cas. 528. However that may have been, that case differs so much in its facts from the case now before us that it is unnecessary to consider it more particularly."

The writer confesses some difficulty in grasping this distinction in principle. The proximity in point of time of two occurrences would not seem to affect the status of one of those occurrences in the matter of causation as related to some ultimate effect. As between themselves, one of such occurrences may occupy the relation of effect to the other. But as to the ultimate effect each occurrence may occupy the relation of a contributing cause. Regardless of the rule in metaphysics (and we apprehend that there is as little unanimity in that branch of science as there is in the law) there may be, as viewed by the law, more than one direct and proximate cause of a given effect. The question of causation, in adjusting the rights of litigants, is determined by applying general principles, deduced from common experience, to a given state of facts. In so far as failure may obtain in any particular case, such failure is due to the infirmity of human reason and the difficulty at all times to apply general principles, which are themselves primarily deduced from specific facts, to the manifold transactions of human life arising after these principles have been announced.

But while difficulty is experienced in distinguishing in principle the Booth Case from the Hamilton Case, the same difficulty arises when we seek to reconcile the former with the other cases above referred to, decided by that great court. We do not find that in any of the other cases the question of what may or not be the predominant or controlling cause has been considered as having any controlling weight. In all these cases, where it can be said that a danger or peril insured against proximately contributed to the loss, liability exists. We do not find that the case of the Booth has been followed in the application it makes of the doctrine of predominant cause. It might be added that it is evident that the terms "proximate" and "remote cause" are not used in the cases quoted from in the same sense that those terms are used in ordinary negligence cases. In many of these cases when the term "remote cause" is used it is quite apparent, under the facts, that such cause would be denominated proximate, were the question at issue one of liability for negligence.

From these authorities, we conclude that

any sinking of a vessel not brought about by the recognized excepted causes is by a peril of the sea, as that term is used in marine insurance. To hold otherwise would, in our opinion, render such insurance valueless in a large number of cases where sinking arose either from negligence or from other causes operating from within the vessel as distinguished from those operating from without. The sinking, while from one angle it might be viewed merely as an effect and not a cause, is, we think, clearly a cause within the meaning of marine insurance. It would be equally logical to hold that the stranding of a vessel, its striking upon a rock, or collision with another vessel is only an effect, and in order to determine whether such disaster to the vessel was produced or brought about by a peril of the sea, the cause of such stranding, etc., must be inquired into. Yet, it seems to be held universally, or at least by the great weight of authority both in this country and in England, that stranding, striking upon a rock or shoal, or collision, however caused, are perils of the sea. To hold that sinking comes within a different rule is to our mind untenable. All disasters to vessels and their cargoes are produced by natural causes, and disasters, whatever their particular form, whether it be stranding, collision, sinking, or striking upon a rock, are, in every sense, effects of some cause or series of causes. But as applied to insurance indemnifying against loss from these particular perils, they must be regarded as causes, otherwise the insurance is of little or no value. It were equally as logical, we think, to hold that the negligence of the insured in a fire policy, in dropping a lighted match into inflammable substances, thereby causing property insured to be consumed, was the predominant, efficient cause of the loss, and that the fire was only an effect of the negligence, and no cause at all, as to hold that the sinking of the vessel, from whatever cause, is merely an effect of other causes which only brought about the result.

We, therefore, conclude that the trial court correctly submitted the case to the jury, and that the majority of the Court of Civil Appeals committed error in holding that the loss was not covered by the policy.

The other questions presented for our decision have, in our opinion, been correctly determined by the Court of Civil Appeals.

We conclude that the judgment of the Court of Civil Appeals should be reversed, and the judgment of the trial court affirmed.

PHILLIPS, C. J. The judgment recommended by the Commission of Appeals is adopted and will be entered as the judgment of the Supreme Court.