## THE COMMANDANT.

District Court, D. Maryland.　November 18, 1927.

No. 1519.

1. Master and servant ⟨⟩301(4)—Stevedores employed in loading ship lent by foreman to derrick barge to help transfer cargo held in such service servants of barge.

When a derrick barge was about to transfer some heavy steel billets from a scow into a steamship, under a contract, four stevedores engaged in loading the ship, by direction of their foreman, but without orders from the ship or request of the barge, went aboard the barge to help, and their services were accepted. *Held*, under the lent servant rule, in rendering such service they were servants of the barge and not of the ship.

2. Shipping ⟨⟩80—Derrick barge loading heavy cargo into a ship held liable for damage caused by slipping of steel billet from sling.

A derrick barge contracted to transfer some heavy steel billets from a scow into the hold of a ship, and when one was being lowered it slipped from the sling, fell and damaged the ship. *Held*, that the barge was liable for the damage and was not relieved from liability by the fact that it used a sling belonging to the ship, instead of its own or that stevedores from the ship, helped in the transfer, under its direction.

In Admiralty. Suit by the Sudbury Steamship Corporation and the Munson Steamship Line against the floating derrick barge Commandant. Decree for libelants.

Janney, Ober, Slingluff & Williams, of Baltimore, Md., for libelants.

Lord &. Whip, of Baltimore, Md., for respondent.

COLEMAN, District Judge. This is an action in rem against the floating derrick barge Commandant for damages to the steamship Sudbury, caused by the falling of a 17-ton steel billet through the hatch of the No. 1 hold of the Sudbury in the course of being lowered into the hold by the barge from a scow.

By verbal agreement, the owners of the barge contracted to load five billets into the hold of the Sudbury while lying at her pier in Baltimore harbor. This employment was entered into as a result of the steamship having found that its own tackle was not adequate to lift such heavy cargo. The undisputed facts in regard to the method adopted by the barge in undertaking the work are as follows: On the morning in question, she came alongside the Sudbury and, with her own crew, assisted by four stevedores from the Sudbury, removed the scow on which were the billets from the starboard side of the Sudbury, and took up a position herself against the same side of that vessel—that is, between her and the scow—so that she could use her derrick in the easiest manner for lifting and loading the billets into the Sudbury. The employment of the derrick barge was in general terms, with no understanding as to what, if any, part the ship's crew or stevedores should play in the operation. The four ship's stevedores just referred to appear to have been ordered by their foreman on the steamship, to go aboard the scow and help. It does not appear that this arrangement was the result of any specific request from the derrick barge or of any express offer on the part of the steamship. None of the steamship's crew or tackle took any part in the work; nor did any of her other stevedores, except after the cargo had been lowered into her hold. The stevedore foreman and gang foreman were idle during the loading. The four stevedores from the ship put the cable slings around the billets preparatory to their being hoisted from the scow. These slings belonged to the steamship and were offered without any request by those on the barge, one of the slings being in the position under a billet in which it was left from the unsuccessful attempt the day before to raise the billet with the ship's own tackle.

The derrick barge had ample slings of its own, but did not use them. The shackles on the ship's slings did not fit the derrick barge's tackle, so, at the direction of the master of the derrick barge, the four stevedores assisted in changing the shackles. But beyond this direction, given to the stevedores, there is no affirmative evidence that they received or obeyed any other orders from those on board and in charge of the derrick barge during any part of the loading, although the master and mate of the derrick barge personally showed the stevedores how to put the slings into the shackles. In addition to the master and mate, the crew of the derrick barge consisted of two men in the engine room, one to control the raising, lowering, and booming out of the boom; the other, the swinging of it forward and aft; and a third person, a signal man, who took a position on the deck of the steamer and signaled to the engine room of the derrick barge by a special, portable electric bell contrivance. The mate stood on the deck of the derrick barge, and upon receiving a signal from one of the four stevedores that a billet was ready to be raised, would himself signal to the derrick barge engine room, and the signal man on the deck of the steamer would in turn give the necessary signal, by bell, direct to that engine room, when to stop and when to lower away into the hold. In other words, the entire operation of lifting the cargo from the scow and placing it in the hold of the steamer was under the direct control and supervision of those attached to the derrick barge and not to the steamer, except after each billet had been actually lowered into the hold, when subsequent operations of the derrick were controlled by orders given by the stevedores in the hold of the steamer to the signal man of the derrick barge, above referred to, stationed on the steamer's deck.

Two billets had been successfully loaded in the above manner when the third one, with no apparent change in the method of slinging and hoisting it, fell out of the sling when it was over the hatch and on the point of being lowered into the hold. By a stroke of good fortune, none of the stevedores was in the path of danger, but obviously, from its great weight and the height from which it fell, the billet caused considerable damage to the hull of the steamer, the exact amount being left the subject of future determination. The sling did not break, nor is there any affirmative evidence that the kind of sling that was used on this billet, which was the same that was used on the two other billets successfully lowered, namely, a single cable with a single turn, was not adequate or customary for this kind of cargo, although, after the accident, word was sent down from the steamship not to load any more billets without using a sling with a double turn. There is also some testimony of a stevedore superintendent that the single turn sling is not a safe kind to use under these circumstances.

Four eyewitnesses testifying on behalf of libelant have stated positively that they saw the billet strike, with a grazing blow, the hatch coaming, causing the loop of the sling nearest to the end of the billet which struck, to slide down towards the other loop, upon being relieved of some of the weight placed upon it, and that the swinging of the billet being continued over and towards the port side of the hatch, the end of the billet which had struck the hatch coaming, slipped out of the sling, whereupon the billet, being completely released, fell, with this end first, down into the hold. As against this testimony, one witness for the respondent, the signal man on the steamer, denied that the billet struck the coaming. He testified that the billet was a foot and a half above the hatch coaming when it fell out. He gave no explanation of the cause of its so falling. Libelant offered no proof of damage to the coaming.

On this state of facts, the contention of libelant is that the derrick was responsible for the entire operation, and that therefore whether the billet fell because the sling in which it was placed was improper, or because there was negligence in permitting the billet to strike the coaming, or both, does not alter the liability. On the other hand, respondent claims that the operation is properly divisible into two parts, namely, the work connected with the fitting of the slings to the billets before they were raised from the scow, and the subsequent work of raising them and lowering them into the steamer, claiming that the first part was work which was undertaken by the stevedores belonging to the steamer, and that it had never been delegated to or placed under the control of the derrick barge; whereas, the second branch of the work was the part, and the only part, within the contemplation of the terms of the derrick barge's employment, pursuant to which those in charge of her acted.

[1] In order to determine which of the above contentions is sound, we must first determine the exact status of the four stevedores who placed the slings around the billets and adjusted the shackles to the derrick barge's gear. Were they loaned to the derrick barge under such conditions as would make them responsible not to the steamer, but to the derrick barge, or were they still to be considered as servants or agents of the steamer? This question is to be answered by the degree of supervision and control to which they were subjected on the part of those on the derrick barge. As above shown, there is no proof of any definite agreement as to their exact role, nor as to any one particular person, either from the steamer or from the derrick barge, who should give them definite orders. They were told to go aboard the derrick barge and help, and, when they got aboard, their help was accepted, at least to the extent that it was found to be necessary or desirable in adjusting the slings and shackles. They received their regular wages from the steamer without any adjustment or payment on the part of the derrick barge.

From all of these facts, taken as a whole, the court is forced to the conclusion that they were under the control of the derrick barge and not of the ship, and were, therefore, within the generally accepted test of the lent-servant rule, which makes such a servant no longer responsible to the original master, but to the one to whom he has been lent. The Standard Oil Co. v. Anderson, 212 U. S. 215, 29 S. Ct. 252, 53 L. Ed. 480; The Slingsby (C. C. A.) 120 F. 748. As was said in the Standard Oil Case, pages 221, 222 (29 S. Ct. 254): "To determine whether a given case falls within the one class or the other, we must inquire whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking." And again in the Slingsby Case, page 751: "Of all the tests which have been suggested, and the authorities are far from uniform, it would seem that this, *the power of substitution of one man for another, is the most satisfactory.*" (Italics inserted.)

[2] Respondent claims that these stevedores worked entirely independently of any control by the derrick barge; that is, that they were still attached to and were responsible solely to the ship. The court feels that the distinction, upon which this claim is necessarily predicated, between the work of slinging and the rest of the work in connection with the billets, is an artificial and untenable one under the circumstances. In other words, it feels that the implied obligation of the derrick barge, when it undertook the job in question, required it to supervise and be responsible for every step in the operation from the time it had anything at all to do with the billets; that is to say, the court is not impressed with the argument that an independent contractor, in undertaking to unload from one vessel and load into another a cargo of such great size and weight, fraught with much danger if not handled in the most experienced way, can be

allowed to say, in the absence of some more definite agreement than exists here, that it is not just as much its duty to see to it that the tackle around the cargo is in every way proper and properly adjusted and operated, as it is to see to it that the rest of the tackle used in the operation is proper and properly adjusted and operated, so that no negligence occurs throughout the entire operation.

If the kind of sling used was not proper under the circumstances, it was the derrick barge's duty to change it, to *substitute* its own men and its own slings for the stevedores and their slings, not merely to accept the word of the stevedores. This is confirmed by the fact that the derrick barge had ready for use on this particular occasion its own slings, both single, like those which were actually used, and also double slings; by the absence of any affirmative testimony that the derrick barge's crew would not have used exactly the same sort of sling of their own, if they had not found the ship's slings already aboard the scow and ready for use, and by the further fact that no evidence has been introduced of a practice on the part of the derrick barge, or of a general custom in these waters, so to divide responsibility in performing work of this character. Also, it appears that the ship had an expert slinger who remained idle, and took no part whatever in this particular operation. The question as to who paid the stevedores' wages is, of course, not conclusive. See Byrne v. Kansas City, Ft. S. & M. R. Co. (C. C. A.) 61 F. 605, 24 L. R. A. 693.

The most that respondent's contention would lead us to is the doctrine of half damages; because, adopting respondent's own argument as to the division of responsibility between that which related to the placing of the slings around the cargo, and that which related to the actual raising and lowering of it, the most that could be claimed is that the faulty character of the sling was a contributing cause, *after* the negligence had occurred which brought the billet into contact with the hatch coaming. However, this is not a case where a fair preponderance, or the weight of the evidence, sustains libelant's explanation of the accident, but in fact is one where *all* the evidence is to this effect. Respondent has left the cause of the accident totally unexplained by any affirmative evidence whatsoever. The fact that the hatch coaming is not shown to have been damaged is not material under the circumstances, because if the billet, while being lowered very slowly, merely grazed or rested upon the coaming, it is quite likely that no real injury resulted.

Upon proof of the actual extent of the damage to the vessel, a decree for an amount covering same will be signed in favor of libelant.