## UNITED STATES v. BETHLEHEM SHIP-BUILDING CORPORATION.

District Court, D. Maryland.    March 19, 1928.

No. 1346.

1. **Negligence** ⬤⟐2—One who is negligent in performing legal duty is liable for proximate consequences, whether duty arises by virtue of contract or relationship.

One who is negligent in performance of a legal duty is liable for proximate consequences of such negligence, whether such legal duty arises by virtue of contract or relationship, for in the former case, as well as in the latter, defendant is liable on basis of tort for failure to measure up to such duty.

2. **Shipping** ⬤⟐76—Independent contractor held liable for sinking of vessel, due to entrance of water through outboard discharge valve, while making repairs necessitating removal of main condenser heads.

Where independent contractor, repairing vessel, failed to make sure by inquiry that outboard discharge valve was closed while making repairs necessitating removal of main condenser heads, it was liable for damage from sinking of vessel, due to entrance of water through such valve, though ship's officers and crew were in charge of vessel at such time, and they alone had right to close the valve, since repairers owed an independent duty, beyond that on part of ship's officers to close valve, to make sure that such valve was closed before proceeding with work.

3. **Negligence** ⬤⟐61(2)—Result is none the less attributable to one's act or omission, because followed or accompanied by other's wrongful omission.

A result is none the less attributable to one's act or omission, because followed or accompanied by wrongful omission on part of some one else, since, if it is duty of two persons to do a thing, and neither does it, the resulting damage is attributable to either failure.

In Admiralty. Suit by the United States against the Bethlehem Shipbuilding Corporation. Decree for the United States.

A. W. W. Woodcock, of Baltimore, Md., and F. R. Conway, of Washington, D. C., for the United States.

W. Ainsworth Parker, of Baltimore, Md., for respondent.

WILLIAM C. COLEMAN, District Judge. The question here presented is as to the responsibility for the sinking of a vessel, due to entrance of water through an outboard discharge valve, which had been left open during repairs, made by an independent contractor pursuant to contract, to the vessel's main condenser, which repairs necessitated the removal of the condenser heads.

The respondent, the Bethlehem Shipbuilding Corporation, contracted by formal written agreement to repair the main condenser of the steamship Eastern Dawn, a vessel belonging to the United States and at the time operated under contract by the Black Diamond Steamship Corporation. The repair work to be performed was particularly described by the following specifications in the agreement:

"Main condenser—Remove all ferrules from both heads; cut off tubes to proper length and repack condenser with corset lacing, replacing ferrules and prove condenser tight.

"Open up and test out main condenser and close up in good order. Any repairs developing will be subject to a separate price."

There was no express provision applicable to the present case covering liability for damage that might arise incident to the work, other than an agreement "to faithfully carry out the work" as set forth in the specifications. The following facts are admitted:

The main condenser of the vessel was located in the engine room on the port side. At each end of the condenser was a cover, which closed it, preventing water escaping from the condenser into the ship. From the top of the condenser rose a pipe, approximately 30 feet in length and 14 inches inside diameter, for the carriage of water from the condenser to a discharge opening in the port side of the vessel. The bottom of this opening on the outside of the vessel was approximately 25 feet 8 inches above the plane of the bottom of the ship, at the level of the upper 'tween-decks and approximately 8½ feet above the top of the condenser. Close to the outboard end of the discharge pipe, and immediately next to the skin of the ship, there was an outboard discharge valve of the non-return, self-closing type, being so designed as automatically to open to permit the egress of water from the condenser, and automatically to close to prevent the entry of sea water into the condenser from outside the vessel. To this valve was attached a stem, on the bottom of which was a weight. In the stem

were two holes, permitting the insertion of a pin, so that the valve could be fastened, opened or closed, by inserting the pin in one or the other of these holes, thus preventing the automatic opening or closing of the valve. When the vessel was down to her mean summer load draft, the discharge outlet was completely submerged; the bottom thereof being approximately 21 inches under water. The vessel was delivered to the respondent at its dry dock with the outboard discharge valve fastened open, in the manner above described. While she remained in dry dock, and at all times until she filled, the valve so remained.

In order to make the repairs to the main condenser, it was necessary for the respondent to remove the condenser covers or heads, which it did with the knowledge of the ship's officers. The fact that the condenser covers could not be replaced until completion of the repairs to the condenser was also known to such officers. The repairs had not been completed when the vessel sank, as hereinafter described. The vessel remained in respondent's dry dock for about 10 hours, then was undocked and, under the direction of her officers, towed to a loading berth, where, also under the direction of her officers, she proceeded to load shelled corn in bulk. The following day she was transferred to another berth, and was further loaded with the same kind of cargo throughout the day until nearly midnight, at which time she had on board a total of 7,205 tons; her total dead weight capacity being approximately 9,000 tons. At about this time respondent's repairmen (the repair work after the ship left the dry dock being done by gangs of four men each, all employed by the respondent), quit work and left the vessel, to resume in the morning. They had been engaged in work at both ends of the main condenser until immediately before leaving, and up to this time no water had entered the vessel from the outside through the condenser.

However, shortly after midnight, one of the vessel's crew discovered water entering the main condenser through the outboard discharge pipe. Members of the crew succeeded, with difficulty, after more than 20 minutes' work, in removing the pin from the valve stem and in shutting the valve; the delay being due to the fact that the pin was fast and the valve corroded or "frozen." This valve had not been overhauled for a period of at least four months. By this time the vessel had so far filled that she was resting on bottom with a list to port, and four or five feet of water above the flooring in the engine room, fire room, and bunkers. Water had passed from the fire room, through the bunker doors, into the bunkers, and from there into No. 2 hold. Had the bunker doors been closed, the flow of water from the fire room could have been prevented. Recovery is sought on account of damage to the vessel and her cargo; also for expenses incurred in salvage of and repairs to the vessel, as well as for other losses claimed to have been a direct result of the accident. The amount of allowable damages, if any, was reserved for future determination.

Libelant contends that respondent owed it the duty to close the valve, or at least to make sure, by inquiry of the ship's officers, that it had been closed, before commencing the work. On the other hand, respondent's contention is that there was no such obligation upon it, but that, on the contrary, the duty devolved upon the vessel. It does not appear from the pleadings whether the suit is asserted as arising in tort or in contract. [1, 2] It is firmly established that one who is negligent in the performance of a legal duty is liable for the proximate consequences of such negligence. This being true, it is immaterial whether such legal duty arises by virtue of a contract or a relationship, for in the former case, as well as the latter, the defendant is liable on the basis of tort for his failure to measure up to such duty. Flint & Walling Manufacturing Co. v. Beckett, 167 Ind. 491, 79 N. E. 503, 12 L. R. A. (N. S.) 924; Mobile Life Insurance Co. v. Randall, 74 Ala. 170; Gill v. Middleton, 105 Mass. 477, 7 Am. Rep. 548. See, also, The Quickstep, 9 Wall. 665, 19 L. Ed. 767; The John G. Stevens, 170 U. S. 113, 18 S. Ct. 544, 42 L. Ed. 969; The Rose Reichert (D. C.) 242 F. 170. There appears to be no sound reason why such a fundamental rule of liability is not fully as applicable in a court of admiralty as in a court of law. This is not an exceptional, but a general, firmly established doctrine, and therefore one which may very properly be adopted from the common law. See Lloyd Adriatico Societa di Navigazione v. Consolidated Coal Co., 23 F. (2d) 579 (C. C. A. 4th Cir.), where the court held applicable in admiralty the common-law doctrine of anticipatory breach. See, also, Southern Pacific Co. v. Jensen, 244 U. S. 205, 37 S. Ct. 524, 61 L. Ed. 1086, L. R. A. 1918C, 451, Ann. Cas. 1917E, 900.

In Floating Derrick Barge Commandant, 23 F. (2d) 100, which involved the question of liability for the falling of a very heavy steel billet through the hold of a ves-

sel in the course of its being lowered into the hold by a floating derrick barge, this court said, in fixing responsibility upon the respondent, that it was "not impressed with the argument that an independent contractor, in undertaking to unload from one vessel and load into another a cargo of such great size and weight, fraught with much danger, if not handled in the most experienced way, can be allowed to say, in the absence of some more definite agreement than exists here, that it is not as much its duty to see to it that the tackle around the cargo is in every way proper, and properly adjusted and operated, as it is to see to it that the rest of the tackle used in the operation is proper, and properly adjusted and operated, *so that no negligence occurs throughout the entire operation.*"

While the accident in The Commandant was entirely different, the general relationship of the parties was the same, and the standard of care by which liability was determined in the one case is directly applicable to the other. In short, in the present case we must determine at the outset what was "the entire operation" which the independent contractor, the Bethlehem Shipbuilding Corporation, was obligated to perform. Specifically, it was to repair the main condenser; but certainly it cannot be argued, under any theory of law, that such work could either be commenced or proceeded with unless there were taken into account the consequences which might reasonably be anticipated to result from such work to other parts of the vessel's machinery, and therefore to other parts of the vessel itself. It may not be one's legal duty personally to do certain things directly related to the contractual obligation in hand, but it may very well be one's legal duty to refrain from performing that task unless and until he is reasonably sure that those other things have been done by others, so that he may perform his task with reasonable safety. Applying this rule, then, to the independent contractor doing work aboard a vessel, of a specialized character, which he holds himself out as qualified to perform, can he be said not to be charged with an obligation *to make sure* that such work can be performed with reasonable safety? Obviously, he must be so charged. We then come to the next step, which is to determine how far he must go, under given circumstances, in order to satisfy this obligation; that is to say, what is the test of reasonable care or prudence that must be exercised in the given case?

The real basis of libelant's contention is that respondent failed to inquire whether the outboard discharge valve was closed before beginning the repairs. The court believes that the test of inquiry is a proper one to apply under the circumstances, notwithstanding the fact that it is conceded the vessel at the time was in sole charge of her officers and crew, and they alone had the right to close the valve, because it appears from the evidence that, with the condenser heads in place, the safety or seaworthiness of the vessel and her cargo, both in port and at sea, was not affected by the valve being open; that it was customary to leave the valve open, both in port and at sea, and that as a matter of fact there was an advantage in keeping the valve open while at sea, because there was thus overcome the pressure of the weight of the valve, thereby reducing the pressure of the condenser tubes in the condenser.

The foregoing facts were testified to by the vessel's master, chief engineer, first assistant engineer, the oiler on duty, and by a marine surveyor and consulting engineer of long and varied experience, and not refuted by respondent's testimony. It was also testified, without contradiction, by the assistant steamboat inspector at Baltimore and two competent marine surveyors and engineers, that, before commencing any work necessarily involving an outlet, it was always customary for repairmen to see to it that such outlet was closed. Although the condenser heads were not removed until the vessel had left the dry dock, nevertheless the aforegoing precaution seems equally essential, whether the repairman be a bailee of the vessel or merely responsible for a particular piece of work aboard of her.

[3] What, then, do the facts disclose respecting inquiry on the part of respondent? It appears that no inquiry was in fact made. Respondent seeks to excuse this by pointing out that the condenser covers were removed pursuant to contract, and with the knowledge of the vessel's officers, when the outboard discharge valve was more than 12 feet above the water; that the ship's officers knew the condenser covers could not be replaced until the completion of the repairs; that the chief engineer had given orders on coming into port to close the valve, which he thought had been done, and that he understood that, during the repairing, neither he nor any of the other officers or crew was to have anything to do with the valve. In short, respondent claims that such testimony shows a representation by libelant's officers to respondent that the respondent might safely proceed to take off

and leave off the condenser heads—a representation by conduct, although not by words. Respondent further claims that in the face of this testimony an actual inquiry would have been futile, because it would have been answered by assurance that the valve was closed. But this assumption is not warranted under the circumstances, for it is just as reasonable to suppose that, if some direct inquiry had been made, the ship's officers would have made an investigation; that is, until such inquiry has been made, it is not fair to speculate as to its effect.

Respondent also stresses the fact that the ship's engineers were in the engineroom, supervising the work. But the evidence shows that they had no control over the workmen, but merely the right to object at the time, if they considered any part of the work was being done improperly. The chief engineer testified that he "never thought about the condenser and looking at the discharge valve," after arriving at Baltimore. In the face of this testimony, other testimony, on behalf of respondent, that it was common practice to ask whether everything was in proper shape for the repairmen to proceed, and that it was therefore *supposed* that such inquiry was actually made in this instance, is not controlling. A result is none the less attributable to one's act or omission, because followed or accompanied by a wrongful omission on the part of some one else; that is, if it is the duty of two persons to do a thing, and neither does it, the resulting damage is attributable to either failure. Harwell v. Columbia Mills, 112 S. C. 177, 98 S. E. 324; Western Union Telegraph Co. v. Huffman (Tex. Civ. App.) 208 S. W. 183; Clarke v. Mannheim Ins. Co. (Tex. Com. App.) 210 S. W. 528. Thus, as between ship and cargo, we may assume a duty on the part of the ship's officers to close the valve, and yet, independently of this, the respondent owed a duty to the ship to make sure that the valve was closed, by virtue of the admitted fact, known to all, that the work could not be safely prosecuted unless it were closed. See Ellerman Lines v. Smith's Dry Docks Co., 18 Lloyd's List Law Reports, 172, 176.

The respondent, therefore, being negligent in its failure to make sure, by inquiry, that the valve was closed, is liable for all proximate consequences thereof. It is equally true, of course, that it was the duty of libelant to prevent, or minimize, any damages, in so far as it might reasonably do so. However, respondent cannot invoke this principle to escape liability by showing that, had the valve

been in good working order and thus capable of being quickly closed, a relatively small amount of water would have entered the vessel, because, since it was respondent's duty to inquire in the first instance about the valve, such inquiry, if properly made and followed up, would have disclosed the true situation. Therefore the failure to inquire remains the proximate cause of the damage.

But respondent further claims that the damage in No. 2 hold resulted from negligent failure on the part of libelant to close the water-tight doors in the bulkhead. However, the testimony of the ship's officers and crew indicates that, assuming it had been possible to close this bulkhead before any substantial amount of water had reached the cargo, such action would have increased, and not minimized, the damage, because the result would have been to flood both boilers, and perhaps cause an explosion, thus entailing greater loss.

The aforegoing conclusions are entirely consistent with the decision in Bethlehem Shipbuilding Corporation v. Joseph Gutradt Co. (C. C. A.) 10 F.(2d) 769, a case distinguishable, however, on the facts, since it involved negligence respecting something expressly embraced in the contract then before the court.

Upon proof of the extent of damage sustained by libelant in accordance with the foregoing, a decree will be entered accordingly.