## UNITED STATES v. BETHLEHEM SHIPBUILDING CORPORATION.

District Court, D. Maryland. November 2, 1928.

No. 1346.

For former opinion, see 25 F.(2d) 157.

F. R. Conway and E. B. Hayes, both of Washington, D. C., and A. W. W. Woodcock, of Baltimore, Md., for libelant.

W. Ainsworth Parker and James McKown, both of Baltimore, Md., for respondent.

WILLIAM C. COLEMAN, District Judge. This case is now before the court as the result of a petition by respondent to reopen it for the purpose of taking additional and newly discovered evidence. The question presented at the original hearing involved the responsibility for the sinking of the steamship Eastern Dawn (a vessel belonging to the United States and at the time operated under contract by the Black Diamond Steamship Corporation), due to entrance of water through an outboard discharge valve, which had been left open during the making of repairs by the respondent to the vessel's main condenser, pursuant to formal contract, these repairs necessitating the removal of the condenser heads.

On March 19, 1928, this court rendered a decision imposing liability upon the respondent on the ground that an independent contractor, while repairing a vessel, owed an independent duty to inquire of those in charge of the vessel, in order to make sure that the vessel was in proper condition to permit of such repairs. 25 F.(2d) 157. In other words, the court decided that the repairman was obligated to take into account the consequences that might reasonably be anticipated to result, from his work to other parts of the vessel's machinery, and therefore to other parts of the vessel itself; that notwithstanding the fact that the vessel was at the time in sole charge of her officers and crew, and they alone had the right to close the valve in question, the repairman was bound to refrain from performing his task unless and until reasonably sure that it could be performed with safety, and that the test of inquiry was the proper one under the circumstances. The original testimony disclosed no inquiry whatsoever by the respondent.

Following the decision, the respondent petitioned for a reopening of the case for the purpose of having the additional testimony taken of the machinist foreman who had charge of the repair work in question for the respondent, and who, as the petition alleged, was not known by the respondent to have possessed any knowledge or information with respect to the point in issue until after the conclusion of the case. On this showing, the court reopened the case to permit the taking of Machinist Foreman Duncan's testimony, and also, as a result of a petition by the libelant, accorded libelant the right to introduce further testimony from certain of its witnesses who had previously testified by deposition only. As a result, the testimony of Machinist Foreman Duncan and of First Assistant Engineer Hilke was heard in open court with respect to the single question involved, namely, whether or not there had been any inquiry made by the respondent as to whether the vessel was in such condition that the respondent might proceed with safety to make the repairs.

Machinist Foreman Duncan testified that he showed First Assistant Engineer Hilke complete specifications of the work to be done, that he asked him "if everything was all right to go ahead, and, receiving his O. K. to go ahead," he removed the condenser head. He further testified that, later on the same day, he notified Mr. Hilke that the vessel was shortly to be taken off dry dock, and for him "to make sure that everything was in shipshape for being afloat," to which he replied, "All right," at the same time trying the main injection valve, which, upon finding it open, he closed. Duncan admits that he made no inquiry with respect to the discharge valve,

or any particular valve, but simply made a blanket inquiry.

First Assistant Engineer Hilke admitted that "somebody did tell me about shutting the injection; I do not know whether it was Mr. Duncan or not," and further admitted, "it was somebody that did ask me that, if the valves, if the ship was safe to go off dry dock, these different valves being shut on the bottom of the ship." He further said that he did not look at the outboard discharge valve, because, it being some 12 or 14 feet above the water line, there was no danger from it as the vessel went off dry dock, but that he did examine the sanitary valve and the main injection valve, finding the former open, which he closed, and the latter already closed. When Hilke testified previously by deposition, he admitted that some one may have made an inquiry of him respecting those valves, but he was unable to say with any certainty whether or not such inquiry had in fact been made.

Testimony being no longer lacking with respect to the question of inquiry upon which the case hinges, the only question, therefore, remaining to be determined, is what weight shall be given to this testimony. Duncan's statement that he did inquire of Hilke is not only not contradicted by the latter, but Hilke himself admits that some one did inquire of him with respect to the condition of the valves generally. He does not identify Duncan as the one who made the inquiry. Of course, affirmative evidence, even though uncontradicted, is not to be accepted, if it does not bear the stamp of truth, and in the present situation Duncan's testimony should be scrutinized all the more carefully before accepting it, because, if accepted as true, then the court is required to amend its former decision and find the respondent not liable for the damages which occurred.

Under all the circumstances, the court finds no reasonable ground for discrediting Duncan's testimony. He gave the appearance, as did Hilke also, of trying to tell the truth. There was no apparent motive for his not doing so, although no longer in the employ of the respondent. He is an intelligent, mentally alert person, and, while it is quite natural for one's recollection to be obscure with respect to events that happened some six years previously, the court is constrained to accept Duncan's version as being substantially accurate as to what actually occurred. While Hilke gave the impression, also, of testifying to his best recollection, he is obviously not as intelligent a person as Duncan, and his testimony was throughout very much less positive. But in any event Hilke admits that some one addressed to him a general inquiry about the valves. On this state of the evidence, the court must find, contrary to its findings before the additional evidence was taken, that the respondent did do all that was required before commencing the work.

The court, in its original opinion, did not say, nor did it intend to imply, that the obligation to inquire was a continuing one, or that it called for more than such general inquiry as would place those in charge of the vessel on notice as to the character of the work that was about to be done. Thereafter, clothed with such knowledge, it became their duty to take all reasonably necessary precautions. In its opinion, the court said, page 160: "Respondent further claims that in the face of this testimony an actual inquiry would have been futile, because it would have been answered by assurance that the valve was closed. But this assumption is not warranted under the circumstances, for it is just as reasonable to suppose that, if some direct inquiry had been made, the ship's officers would have made an investigation; that is, until such inquiry has been made, it is not fair to speculate as to its effect." It now develops that direct inquiry was twice made, but that, instead of doing his full duty thereafter, Hilke, the first assistant engineer of the vessel, made only a superficial investigation, and omitted to make sure that the particular valve, namely, the outboard discharge valve, the closing of which was absolutely essential to the safe prosecution of the work under the conditions agreed upon, was closed.

The libel must therefore be dismissed.