UNITED STATES of America, as owner of THE P & T PATHFINDER, ex THE DUPAGE and otherwise known as THE USMC HULL NO. 389, Libellant,

v.

NEWPORT NEWS SHIPBUILDING AND DRY DOCK COMPANY, a corporation, Respondent.

No. 152.

United States District Court
E. D. Virginia, Newport News Division.

Jan. 7, 1955.

1. Now 35 U.S.C.A. §§ 253, 288.

finder, hereinafter referred to as "Pathfinder" or "vessel", ex U. S. S. Dupage and otherwise known as USMC Hull No. 389), has instituted this *action for indemnity*, civil and maritime, against the respondent, Newport News Shipbuilding and Drydock Company, seeking to recover the sum of $14,691.53, plus interest and costs, alleged to be due by reason of claims paid by libellant to third parties arising out of cargo damage sustained on the first voyage of the vessel following its reconversion by respondent pursuant to a written contract with libellant.

There is little or no dispute with respect to the material facts of the case. Libellant rests its case on the exhibits attached to the libel, a stipulation filed October 5, 1954, admitted as evidence, and libellant's Ex. No. 2 which is a "position description" relating the duties of one A. Claude, Chief, Inspection and Performance Division of the United States Maritime Commission, an agency of libellant. Respondent relies upon the testimony of Carl B. Penney, respondent's assistant manager of ship repairs, together with the following exhibits briefly described:

Def. No. 1—A letter from Pope & Talbot, Inc. (operators of the vessel under a service agreement from libellant), dated 9/5/47, relating to work performed following respondent's delivery of the vessel to libellant, with attached sheet referring to Item No. 8 covering the corrective repair to that part of the vessel alleged to have been the primary cause of the damage here involved.

Def. No. 2—A letter dated 3/19/48 from the Maritime Commission to respondent making claim in the sum of $543.87 covering corrections accepted by respondent as its responsibility, including Item No. 8 in the sum of $27 indicating repairs to that part of the vessel alleged to have been the primary cause of the damage here involved.

Def. No. 3—A certificate of delivery of the vessel by respondent to libellant as of 5/5/47, said certificate of accep-

---

Baird, White & Lanning, U. S. Atty., L. S. Parsons, Jr., Edward R. Baird, Norfolk, Va., for libellant.

Montague, Ferguson, Holt & Cumming, Wm. McL. Ferguson and J. Warren Stephens, Newport News, Va., for respondent.

HOFFMAN, District Judge.

Libellant, United States of America (as owner of the Steamship P & T Path-

tance by libellant containing the following language:

"Said vessel is hereby accepted under and pursuant to the terms of said contract for the reconversion of said vessel, without waiver of any of the terms and conditions of same. Attached hereto is a list of items not completed in accordance with the terms of said contract at the time of delivery". (None)

Def. No. 4—Certificate of Maritime Commission indicating delivery of vessel to Pope & Talbot, Inc., as of 5/5/47.

Def. No. 5 and No. 5A—Letter dated 9/29/48 from Maritime Commission to respondent indicating respondent's reimbursement to Pope & Talbot, Inc. on guarantee liability, stating in part as follows:

"We therefore consider that you have no further guarantee liability on these vessels, and we are closing our records accordingly".

Def. No. 6—Letter dated 9/17/48 from respondent to Maritime Commission stating that respondent had reimbursed the owners for items of contractor's guarantee liability.

From the testimony and exhibits adduced the facts appear to be substantially as hereinafter set forth. Following the termination of World War II the libellant sought to reconvert certain troop ships into cargo vessels. The respondent was awarded the contract for the Pathfinder, as well as three other vessels. Delivery for the purpose of reconversion was on December 13, 1946, for completion within 90 days. The time limit was subsequently extended by agreement and no delay is involved herein. In accordance with the plans and specifications, respondent became obligated to remove and "blank-off" a 1¼-inch waste line on the starboard side of the vessel. Respondent, in the course of reconversion, removed the 1¼-inch waste pipe, but failed to seal the line or "blank-off" the same by the insertion of a flange or welded insert. There were apparently between 150 to 200 similar pipes to be "blanked-off" on

this particular job. While respondent denies any negligence or failure to complete the contract as per the plans and specifications, it admits that it has no evidence to contradict libellant's evidence as revealed by the stipulation, and further concedes that it has no affirmative evidence indicating any tampering with the line or pipe following delivery by respondent to libellant on May 5, 1947. The Court therefore finds that the respondent failed to complete the contract as per the plans and specifications, and was negligent in such failure.

At the time of the delivery of the vessel on May 5, 1947, it was inspected by the respondent, the American Bureau of Shipping Inspectors, the U. S. Coast Guard Inspectors, the Maritime Commission Inspectors, and inspectors of Pope & Talbot, Inc., to whom the vessel was delivered by the Maritime Commission on the same day. Admittedly, no inspector noted the defect referred to in the preceding paragraph.

Respondent urges that its liability was limited to the cost of repairs, i. e., $27, in accordance with Art. 19 of the contract between libellant and respondent, and that, further, the libellant had a duty of inspection. Respondent also urges that the Maritime Commission released respondent from all contractual liability (Def. Ex. 3, 5 and 5A) and hence cannot recover anything for its indemnity claim.

The pertinent portions of the contract are set forth as follows:

"Article 19: *Guaranty Period.* (a) If at any time within 6 months after the acceptance of the vessel by the Commission, any weakness, deficiency, defect, failure, breaking down, or deterioration in material or workmanship furnished by the Contractor hereunder, other than that due to ordinary wear and tear, or the negligence or other improper act of the Commission (including any purchaser or charterer of the vessel during said six month period) shall appear or be discovered, such defec-

tive workmanship or material shall, at the Contractor's expense, be made good to the satisfaction of the Commission. However, the liability of the Contractor hereunder shall not extend beyond the actual repair or replacement of such defective materials or workmanship, nor shall the Contractor be liable for consequential damages, except that in the event any defect in any item of machinery or equipment purchased and installed by the Contractor causes any damage to such item of machinery or equipment, the Contractor shall be liable not only for the cost of correcting or repairing such defect but also for the cost of correcting or repairing any damage to such item of machinery caused by such defect. Any such work required to be done shall be carried out if practicable, and at the Commission's option, at the Shipyard. The Commission may, however, have such work carried out at any port in the United States, and in that event, the Contractor shall be liable for the expense thereof at the prevailing local commercial rates, including cost of dockage of the vessel if necessary. Should the Contractor so desire, it may have an engineer on board at any time during said six month period, who shall have full opportunity to observe and inspect the working of the vessel in all of its parts, but without any directing or controlling power over the same. In computing said period of six months from the date of acceptance, the time, if any, but only such time, shall be excluded during which the vessel is not available for service on account of any weakness, deficiency, defect, failure, breaking down or deterioration of the work covered hereby for which the Contractor is responsible as herein provided."

"Article 11: *Inspection—Approval of Plans.* (a) All material and workmanship (not otherwise designated by the Plans and Specifications) shall be subject to inspection, by inspectors of the Commission and representatives of the American Bureau of Shipping and all Governmental agencies having jurisdiction in the premises, at any and all proper times during manufacture or construction at any and all places where such manufacture or construction is carried on.

"(b) The Contractor shall furnish promptly, without additional charge, all reasonable facilities and materials, including suitably furnished offices with light, heat, telephone, desks, drawing tables, and filing cabinets, necessary for the safe and convenient inspections and tests that may be required by the inspectors. The Contractor shall also furnish suitable and adequate office space and facilities for the auditors or other representatives of the Commission in performance of duties assigned hereunder.

"(c) Blueprints of all working plans as they are prepared during the progress of the work shall be submitted (in such numbers as may be required) to the Commission for action and it shall promptly take appropriate action in the time required by the Plans and Specifications. No work hereunder shall be commenced by the Contractor until the working plan applicable to same has been approved by the Commission.

"(d) The Commission shall promptly pass all work and material conforming to the requirements of this contract, and shall promptly reject all work and material not conforming to the requirements of this contract. Rejected workmanship shall be satisfactorily corrected, and rejected material shall be satisfactorily replaced with proper material without charge therefor, unless such work or material shall have been furnished by the Commission, in which event the remedying of such defective work, or the replacing

of such defective material, if done by the Contractor, shall be treated as a change under this contract. The Contractor shall promptly segregate and remove the rejected material.

"(e) All inspection and tests by the Commission shall be performed in such manner as not to unnecessarily delay the work. The Contractor shall be charged with any additional costs of inspection when material and workmanship are not ready at the time inspection is requested by the Contractor.

"(f) Any dispute between the Contractor and any representative of the Commission under this Article, shall be referred promptly to the Commission, and the decision of the Commission thereon shall be final and conclusive.

"(g) The provisions of this Article are subject to the provisions of other Articles of this contract and specifications relative to the trials and acceptance of the vessel."

"Article 27: *Performance and Material and Labor Bonds.* (a) The Contractor agrees to furnish to the Commission within 10 days after the execution and delivery of this contract on the part of the Contractor, the following bonds, satisfactory to the Commission in form and as to the sufficiency of the surety or sureties:

"(1) Performance bond in the sum of $142,000.00 conditioned upon the faithful performance by the Contractor of all the terms, covenants, and conditions on its part in this contract to be performed at the time or times and in the manner herein stipulated, including without limitation of the foregoing, the covenant of the Contractor to indemnify and save harmless the United States, the Commission, and every other agency or instrumentality of the United States from and against any and all claims, charges, liens, and encumbrances, on or against the vessel and the materials, supplies, or equipment furnished or installed therein, existing on the date of delivery and acceptance of the vessel by the Commission, or thereafter arising or in any manner growing out of the reconversion of the vessel, and resulting from any act or omission of the Contractor, excepting, however, (1) the covenant to make prompt payment to all persons supplying labor and material in the prosecution of the work to be performed hereunder as covered by the payment bond described in subparagraph (2) of this Article 27, and (2) the covenants or agreement contained in Article 21 hereof on the part of the Contractor to pay to the Commission excess profits as therein provided; * * *."

Pope & Talbot, Inc., took possession of the vessel at Newport News, Virginia, on May 5, 1947, under a General Agency Service Agreement and, after loading cargo at Baltimore and Norfolk, commenced its voyage to California as a common carrier for hire. During the voyage the discharge line involved became submerged and sea water entered the No. 3 hold through the discharge line and the 1¼-inch waste line connected with the discharge line. The damaged cargo was delivered in California to the owners or persons entitled thereto according to the terms of the bills of lading. Claims presented by the owners of damaged shipments were thereafter presented, processed, and, in due course, reasonable settlements were effected. The first payment was made on September 18, 1947, and the last on August 18, 1949.

From a consideration of the foregoing facts and the able briefs and argument of counsel, the Court has reached the inescapable conclusion that the libellant is entitled to recover from respondent the sum of $14,691.53, plus interest at the rate of six per centum per annum, calculated from the dates of the various payments made to the parties entitled thereto.

While the contract in question presents issues which have been carefully considered by the Court, it must be remembered that this is not an action upon the contract itself, but is a *suit for indemnity*. Certainly the respondent could not have successfully defended the claim of any owner of a damaged shipment, had that owner elected to sue this respondent in tort and disregarded its claim against libellant. It is the opinion of this Court that the indemnity claim is enforceable irrespective of the provisions of the reconversion contract.

Disregarding, for the moment, the written contract between the parties, the present controversy falls squarely within the rule in Bethlehem Shipbuilding Corporation v. Joseph Gutradt Co. (The Ecuador), 1925 A.M.C. 818, affirmed 9 Cir., 10 F.2d 769, 1926 A.M.C. 342. The Gutradt Company made a contract of affreightment with Pacific Mail Company to ship a quantity of soap from the West Coast to Norfolk, Virginia. Only two days prior to the commencement of the voyage, Pacific Mail had acknowledged delivery of the vessel, Ecuador, following repairs by Bethlehem which included overhauling the clapper valves. During the process of stowing the cargo in No. 2 hold a stevedore noted that the forward port clapper valve was uncovered. The cover was located lying with the bolts on a cargo batten and the Engineer proceeded to bolt it into place. In checking the remaining valves in No. 2 hold the Engineer found them covered with cargo. He then went into the other holds and found all valves in sound condition. Approximately 24 hours after departing it was discovered that a considerable quantity of water was in the No. 2 hold. Thereafter the ship put in at Wilmington, California, and, after unloading the cargo in the No. 2 hold, it was determined that one clapper valve was uncovered and another cover was in a reverse position, thereby causing the cargo damage. The valve fixed by Engineer before leaving San Francisco was sound. Suit was instituted by Gutradt against Pacific Mail seeking recovery of the cargo loss,

and Bethlehem was thereupon impleaded by Pacific Mail. The Court held that Gutradt was entitled to recover from Pacific Mail, but that Pacific Mail could obtain judgment over against Bethlehem.

The striking similarity of the factual situation presented in The Ecuador as related to the present controversy is most persuasive. It is true that no particular contract provisions were in issue before the Ninth Circuit, but it is not unlikely that counsel for Bethlehem may have concluded (as this Court has determined) that such contractual provisions were not applicable. If actions had been instituted against the now libellant by the freight claimants in this case and the United States had impleaded the present respondent, it is difficult to conceive how the Shipbuilding Corporation could escape liability for a judgment over. It is fundamental that the United States could not successfully defend any action brought by a freight claimant as the duty of making a vessel seaworthy is nondelegable. The duty to repair could be delegated and the Court, in The Ecuador, held that Pacific Mail's cause of action for reimbursement was properly maintained. The Ecuador goes further and points out that the damages recoverable naturally ensued from the breach of contract for repairs, as distinguished from Bethlehem's contention that the cargo damage was special and hence not recoverable. Without reviewing the authorities therein cited, it is sufficient to state that, in the instant case, the damages herein are the natural consequence of what might reasonably have been within the contemplation of the parties. In fact, respondent's witness, Penney, substantially confirms this conclusion by his own testimony (T. 32, 33).

A study of the contract between the parties affords no relief to respondents even if the Court is in error in concluding that the indemnity claim is enforceable irrespective of the reconversion contract. Under Art. 11 there is a right of inspection granted to libellant, but no duty is imposed, and, under Art. 11(g) the inspection provisions are made subject to

the other Articles. As libellant has effectively stated, there would be no reason for inserting Art. 19 into the contract if all liabilities were foreclosed by the right of inspection granted under Art. 11. The Ecuador, supra, thoroughly disposes of this contention. See also: United States v. Bethlehem Shipbuilding Corp., D.C., 25 F.2d 157, reversed on new evidence, D.C., 28 F.2d 880.

Considering Art. 19 and respondent's insistence that the damages herein are "consequential" and hence not recoverable, it is essential that the intent and purpose of Art. 27(1) be examined. Why would the contract require a performance bond providing for the payment of "all claims" existing on the date of delivery, *"or thereafter arising or in any manner growing out of the reconversion of the vessel, and resulting from any act or omission of the Contractor"* (respondent)? This "save harmless" agreement would again render Art. 19 meaningless if this Court should now accept respondent's interpretation. Respondent, however, urges that the Court should consider only Art. 19, and particularly the following limitation:

> "However, the liability of the Contractor *hereunder* shall not extend beyond the actual repair or replacement of such defective materials or workmanship, nor shall the Contractor be liable for *consequential damages.*"

The evidence discloses that the contract was signed by respondent as submitted by libellant, although it is conceded that the basic clauses were the subject of negotiations between the Government and the Shipbuilding Trade Organization (T. 37). Even assuming the usual rule that, in the event of ambiguity, the contract should be construed against the libellant herein, a reading of the entire contract does not disclose the existence of any ambiguity and, therefore, the rule is inapplicable. The word "hereunder" does not lend force to the complete exoneration of respondent. It is extremely doubtful

that such a limitation would be valid in law *as the interests of the general public are involved.* Compania De Navegacion Interior (The Wash Gray) v. Firemans Fund, 277 U.S. 66, 48 S.Ct. 459, 72 L.Ed. 787; Fairfax Gas & Supply Co. v. Hadary, 4 Cir., 151 F.2d 939; Otis Elevator Co. v. Maryland Casualty Co., 95 Colo. 99, 33 P.2d 974. In any event, the Court should be most reluctant to construe a contract indemnifying a party against its own negligence unless the terms are clear and explicit. Southern Bell Telephone & Telegraph Co. v. Mayor, 5 Cir., 74 F.2d 983.

Parties to a contract may agree to the exclusion of "consequential damages" and, as to this point, the principal force of respondent's argument is directed. While the Court's prior ruling indicates that the particular provisions of the reconversion contract are not pertinent to the determination of this case, it is, nevertheless, the opinion of the Court that the damages sought to be recovered are not "consequential". There are, however, some conflicting decisions on the interpretation of the words "consequential damages". Respondents rely upon the doctrine set forth in the old English case of Hadley v. Baxendale, 9 Ex. 341, 23 L.J.Ex. 179, and the later American authorities of Washington & Old Dominion Ry. v. Westinghouse Electric, etc., 120 Va. 620, 89 S.E. 131, 91 S.E. 646; Richmond Redevelopment & Housing Authority v. Laburnum Corp., 195 Va. 827, 80 S.E.2d 574; Despatch Oven Co. v. Rauenhorst, 229 Minn. 436, 40 N.W.2d 73; Otis Elevator Co. v. Standard Construction Co., D.C., 92 F. Supp. 603, and Monarch Brewing Co. v. George J. Meyer Mfg. Co., 9 Cir., 130 F.2d 582. In the main, these cases are not persuasive. They are either entirely unrelated to the present state of facts, or point out, by contrast, exactly why the damages sought herein are not consequential. Certain isolated statements in several of these cases would lead a casual reader to accept respondent's contention, but an exhaustive study will single out the pertinent distinctions.

Generally speaking, it is the belief of this Court that the contract limitation excluding "consequential damages" was inserted for the purpose of protecting the contractor from loss of use of the vessel, wages of the crew, etc., during a time the vessel was required to undergo repairs made necessary by contractor's failure or breakdown of materials and at any time within six months after acceptance of the vessel. It is entirely logical that, in the event of weakness or failure in materials, the Shipyard would look to any manufacturer of the material for the resulting loss, and, in such a situation, items of loss of use, wages of the crew, etc., would hardly be recoverable against the sub-contractors. If such a limitation did not appear in the contract, a smaller shipyard could be bankrupt in a matter of hours. It is, therefore, the opinion of this Court that the damages are "direct" and "not consequential" in view of the fact that they were reasonably within the contemplation of the parties and could be reasonably foreseen as a result of the omission of respondent.

There is little need to discuss the point relating to the letter from the Maritime Commission to respondent, dated September 29, 1948, in which the writer stated that respondent had "no further guarantee liability on these vessels". It is sufficient to dispose of this matter by stating that this Court does not believe the specific provisions of the contract are necessary to determine the issue. Indemnity relationships differ from purely contractual relationships. Oceanic Steam Navigation Co. v. Compagnie Transatlantic Espanola, 134 N.Y. 461, 31 N.E. 987; Thompson v. Miller, 195 Va. 513, 519, 79 S.E.2d 643, 647. Aside from the point raised by libellant in producing in evidence its Ex. 2 defining the duties of the writer of the letter in question, it would be absurd to exonerate respondent from a cargo loss caused by water damage on the basis of a statement that "guarantee liability" had ceased. Such a rule would impose an undue burden upon an innocent party and would require a constant check of activities on and off the vessel following the date of delivery.

A judgment order will be entered upon presentation.