TOYOMENKA, INC.
and
**Wilmington Shipping Company,
Appellees,**
v.
**MOUNT HOPE FINISHING COMPANY, Appellant.**
No. 13889.

United States Court of Appeals,
Fourth Circuit.

Argued May 7, 1970.

Decided Sept. 18, 1970.

---

George W. Miller, Jr., Durham, N. C. (Egbert L. Haywood, and Haywood, Denny & Miller, Durham, N. C., on brief), for appellant.

Ellis L. Aycock, Wilmington, N. C. (Stevens, Burgwin, McGhee & Ryals, Wilmington, N. C., on brief), for appellee Toyomenka, Inc.

Alan A. Marshall, Wilmington, N. C. and A. Dumay Gorham, Jr., Wrightsville Beach, N. C. (Marshall & Williams, Wilmington, N. C., on brief), for appellee Wilmington Shipping Co.

Before HAYNSWORTH, Chief Judge, and BUTZNER, Circuit Judge, and RUSSELL, District Judge.

DONALD RUSSELL, District Judge:

This action for conversion involves title to certain textile goods imported into this country for sale. The plaintiff Toyomenka, Inc.,[1] the importer, claiming ownership, sought recovery for their value both from (1) the defendant Wilmington Shipping Company,[2] which, acting as customs broker for Toyomenka in the receipt of such goods, had erroneously shipped the goods for finishing from port of entry to its co-defendant, Mount Hope Finishing Company,[3] a textile finisher, as the property of one Harold A. Jason, Inc.,[4] a textile converter, and (2) from the defendant Mount Hope Finishing Company [3] which, claiming that, as a result of its billing, the goods were the property of Jason, had sold them, following finishing, to Hampton Shirt Company under a claim of authority from Jason and applied the proceeds of such sale towards Jason's past-due indebtedness to it.

Wilmington, by its answer, admitted its error and, for all practical purposes conceded its liability. By way of a cross-complaint, and assuming a recovery over against it, it sought recovery over against its co-defendant Mount Hope on the ground that after notice of Toyomenka's ownership, the latter had wrongfully "sold, converted or diverted same to its own use". Mount Hope, by its answer, alleged that the goods arrived at its plant "by truck with the shipper being designated as Harold A. Jason, Inc.", and that, acting under an agreement with Jason, it sold the goods "in the usual course of its business" "prior to receiving any notice that said goods belonged or were claimed by any other party". Specifically, it alleged that, if Wilmington had made an error in billing, that error was "in all respects

imputed to the plaintiff" since Wilmington "was acting as and for the agent of plaintiff".

The cause was tried with a jury. At the conclusion of the testimony, Mount Hope moved for a directed verdict on grounds not stated in the record. The Court overruled the motion and submitted the case to the jury. Without objection from any party, it instructed the jury that Wilmington's status was that of bailee. The jury returned a verdict for the value of the goods, less finishing charges, in favor of the plaintiff against Wilmington and, in turn, for Wilmington in like amount against Mount Hope. The net result was a verdict for the value of the goods in favor of the plaintiff against both defendants, since the recovery from Mount Hope was for its benefit. Thereafter, Mount Hope moved for judgment n. o. v. Such motion was denied.

Mount Hope now appeals, contending that the District Court should have granted its motion for a directed verdict and its motion for judgment n. o. v., and asserting error both in the Court's Charge and in the admission of evidence. We affirm.

The facts surrounding the controversy are:

On September 11, 1967, Toyomenka, an importer, contracted to sell one Jason, a textile converter, certain textile goods to be imported from Japan. While providing that payment for the goods should be made sixty (60) days after customs clearance, the contract of sale gave the seller authority to change the terms of credit, including even the right to revoke credit entirely. Prior to the arrival of the goods in America, Toyomenka was advised by its own factor that the latter declined to accept any responsibility for credit extended to Jason. On the same day, Toyomenka, acting under the provision of the contract of sale, demanded of Jason a guarantee of payment prior to delivery. Responding on March 7, 1968, Jason wrote Toyomenka that there was some confusion about its factoring arrangements and recommended that Toyomenka "ship any goods for our account to the designated finishing plant, in your (i. e., Toyomenka's) name and release to us for finishing instructions only. We agree to pay for these goods before you release the goods to our account". This proposal of Jason was accepted as a modification in the terms of the contract of sale by Toyomenka, which evidenced its acceptance by issuing a new invoice to Jason dated March 19, 1968. This new invoice established the terms of sale as "cash prior delivery".[5]

The textile goods themselves had been shipped from Japan in the name of Toyomenka. Anticipating the arrival of such goods at Wilmington, North Carolina, Toyomenka had on March 8, 1968, employed Wilmington to enter and clear the goods through customs in the name of Toyomenka and to hold for shipping instructions. In accordance with the understanding between it and Jason, Toyomenka instructed Wilmington, by telephone on March 20, 1968, as confirmed by letter on the day following, to ship the goods "Freight prepaid: in the name of TOYOMENKA INC., (shipper), to: MOUNT HOPE FINISHING CO., BUTNER, N.C. VIA: STANDARD TRUCKING CO.—All charges to be billed to: Harold A. Jason Inc., 10 West, 33rd Str. New York, N. Y." The statement with reference to hauling charges was inserted, according to Toyomenka, because its agreement with Jason contemplated a cash sale, which would include "the trucking charges". Incidentally, Jason never paid the "trucking charges".

The textile goods were received in Wilmington on March 28, 1968, and it was at this point that the mistake creat-

5. That the provisions of a contract may be modified by mutual agreement, see Whitehurst v. FCX Fruit & Vegetable Service (1944) 224 N.C. 628, 32 S.E. 2d 34, 39; Carolina Metal Products Corporation v. Larson (5th Cir. 1968) 389 F.2d 490, 494.

ing this lawsuit occurred. Wilmington, through a freely admitted mistake of its billing clerk, shipped the goods on or about April 2nd to Mount Hope for finishing in the name of Harold A. Jason, Inc. Toyomenka, unaware of the mistake in billing, contracted on April 16, at the suggestion of Jason, to sell to Hampton Shirt Company .the finished goods. On April 19, 1968, while the goods were still in the possession of Mount Hope, Toyomenka discovered that the goods had been erroneously shipped to Mount Hope for finishing in the name of Jason. It promptly advised Mount Hope's agent in New York, Stegeman, of the error and of its ownership of the goods.[6] It, also, called the error to the attention of Wilmington. On that same day, and after being advised of its error by Toyomenka, Wilmington wrote Mount Hope, acknowledging the mistake and affirming that the goods in question were, and should have been shipped as, the property of Toyomenka. From this point the record becomes confusing.

Milliken, the president of Mount Hope, who was at the plant in Butner, North Carolina, testified that the corporation's agent in New York, Stegeman, who had been advised about three. o'clock in the afternoon of Friday, April 19, of Toyomenka's ownership, did not communicate such notice to him until Monday, April 22. He, also, testified that, though he was at his office on Saturday, April 20, he did not receive Wilmington's notification of Toyomenka's owner-

ship until "ten minutes past eight on the morning of Monday, April 22nd, 1968". The same witness said the goods were sold by him prior to April 22nd to Hampton Shirt Company, significantly the same customer to whom Toyomenka had sold the goods on April 16. The circumstances of the sale, as detailed by Milliken, were unusual. At one point he said the goods were sold to Wake Textiles on April 19 and Wake Textiles, in turn, sold them to Hampton Shirt Company. Wake Textiles, however, seems to have been Mount Hope under another name.[7] Actually, Wake never participated in the sale itself, according to all the testimony in the case, except perhaps in the form of bookkeeping entries. Milliken stated in one part of his testimony, that the sale was made by him under authorization from Marks, a vice-president of Jason. Marks, on the other hand, testified the sale was made by him and Stegeman, dealing with Fuchs, the president of Hampton Shirt Company, in New York. Incidentally, Stegeman, though still in the employ of Mount Hope, did not testify;[8] it was explained he was on vacation. Moreover, Marks' testimony suggests clearly that the sale by him and Stegeman to Hampton was on or after April 20.[9] There are other circumstances that support that conclusion. This is indicated by the testimony as to the time and circumstances when the goods were shipped from Mount Hope's plant. A number of bills of lading were introduced in evidence, showing delivery by Mount Hope to carrier, Thurston Motor Lines, on the 22nd, 23rd

6. Stegeman was actively involved in the disposition of the disputed goods on behalf of Mount Hope, as established by the testimony of its witnesses Milliken and Marks. Under those circumstances, notice to him was notice to Mount Hope. See Norburn v. Mackie (1964) 262 N.C. 16, 136 S.E.2d 279, 285; England v. American Southern Insurance Company (4th Cir. 1967) 380 F.2d 137, 140; Union Insurance Exchange, Incorporated v. Gaul (7th Cir. 1968) 393 F.2d 151, 154.

7. Wake was described by Milliken as a sales agent of Mount Hope. Its presi-

dent was Milliken's wife and its sole stockholders were his minor children. Its offices, such as they were, were in the offices of Mount Hope.

8. See Southern Cross Steamship Co. v. Firipis (4th Cir. 1960) 285 F.2d 651, 659, 84 A.L.R.2d 895, cert. denied 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859; Glover v. Yonce (4th Cir. 1951) 188 F.2d 870, 874.

9. Marks in his testimony refers to March 20. It is obvious he is referring to April 20.

and 24th of April and receipt by Hampton on the 23rd or 25th. Milliken stated these bills of lading were in error and that the goods were delivered to Thurston Motor Lines on the night of Saturday, April 20, "without a bill of lading" with instructions from Mount Hope to the driver to "take them to the terminal and leave them on the platform", until advice could be obtained from Hampton about delivery, assuredly an unusual circumstance and one indicating some precipitancy on the part of Mount Hope to get the goods out of its plant prior to the 22nd. He added that "On the 22nd or the 23rd or 24th we told them (that is, Thurston) what to do, whenever we got ahold of Mr. Fuchs (the president of Hampton)." It does not appear, though, from Milliken's own testimony that Mount Hope had a firm agreement with Hampton for the purchase of the goods until sometime during the week commencing April 22nd, several days after Toyomenka had notified Mount Hope, through its agent Stegeman, of its ownership, and some time after Mount Hope claims to have delivered the goods open to Thurston without any shipping instructions. Thus, Milliken testified that on the 22nd, he called Stegeman in New York, because he "wanted Fuchs' okay that he was ready to accept billing, because he had wanted to talk to his lawyer to make sure we were doing the right thing". This testimony would indicate (1) that any discussions with Hampton prior to April 22nd, looking to a sale of the goods, were purely tentative and were contingent on satisfactory advice from Hampton's lawyers and (2) that such arrangements as were made for sale to Hampton were handled by Stegeman in New York and not by Milliken in New York. In sum, the evidence strongly supports the conclusion that neither the sale nor delivery was made until aft-

er Mount Hope had been advised of Toyomenka's interest. Under our view of the applicable law, however, it is unnecessary to resolve this issue. Whether Mount Hope sold the goods to Hampton prior to or after notice, the result will be the same; in either event neither the terms of the Uniform Commercial Code, on which Mount Hope primarily relies, nor the general law of bailment, will sustain Mount Hope's assertion of non-liability.

■■■ The primary thrust of Mount Hope's motion both for a directed verdict and for judgment n. o. v. rests on Section 25–2–403, subsection (2), General Statutes of North Carolina, which is a part of the Uniform Commercial Code.[10] This subsection provides:

"(2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business."

It is clear that, for this subsection to be applicable, there must be three essential steps: (1) An entrustment of goods to (2) a merchant who deals in goods of that kind followed by a sale by such merchant to (3) a buyer in ordinary course of business. And the phrase "deals in goods" is to be construed as one who is engaged regularly in selling goods of the kind. See Note, Uniform Commercial Code, Section 2–403(2): The Authority of a Bailee to Convey Title, 21 Univ. of Florida L.Rev. 241, 247; Independent News Co. v. Williams (3rd Cir. 1961) 293 F.2d 510, 512–513; Atlas Auto Rental Corp. v. Weisberg (1967) 54 Misc.2d 168, 281 N.Y.S.2d 400; cf. Commercial Credit Corp. v. Stan Cross Buick, Inc. (1962) 343 Mass. 622, 180 N.E.2d 88, 91–92. It is unquestionably true that Toyomenka entrusted its goods

10. It was stated on argument here that Mount Hope had not raised at trial, either by request for giving instruction or by motion, the applicability of the Uniform Commercial Code to this proceeding. In fact, it does not appear to have brought the matter to the attention of the District Court on its motion for judgment n. o. v. This circumstance does not, however, in all instances preclude appellate review. Wratchford v. S. J. Groves & Sons Company (4th Cir. 1969) 405 F.2d 1061, 1063.

to another but that bailee was not Jason, as Mount Hope argues, but Wilmington. And Wilmington was not a merchant regularly engaged in selling textile goods, as the statute requires; its business was strictly that of a customs broker. Mount Hope seeks to escape this dilemma by urging that Wilmington, in negligently billing the goods in the name of Jason, was acting as the agent of Toyomenka and that its act, which amounted to an entrustment to Jason, is imputed on familiar principles of agency to Toyomenka. The difficulty with this argument is that the law of North Carolina, which all parties assume to be controlling,[11] is clear that the unauthorized act of Wilmington, the bailee, may not be imputed to Toyomenka. Sink v. Sechrest (1945) 225 N.C. 232, 34 S.E.2d 2, 3; Williamson v. Varner (1960) 252 N.C. 446, 114 S.E.2d 92, 95; 65A C.J.S. Negligence § 161, p. 206. In short, Toyomenka at no time entrusted its goods to a merchant engaged in dealing in such goods or authorized any such entrustment. Its express instructions were to the contrary. Nor for that matter was Mount Hope a "buyer in ordinary course of business", a purchaser who "bought goods in the open market". See Independent News Co. v. Williams, *supra*. It did not acquire possession of the goods as a purchaser in the ordinary course of business but received those goods in its capacity of a textile finisher, for the specific purpose of processing them on behalf of the owner.[12] Mount Hope, also refers in its brief to that portion of Section 2–403 as provides that one with voidable title has "power to transfer a good title to a good faith purchaser for value". Such provision is clearly irrele-vant to this controversy. The basic predicate for the operation of this subsection is title, either actual or voidable, in the transferee (in this case, Wilmington). Wilmington neither had nor claimed any such title. Even less can it be said that Jason acquired any such title. Jason could only acquire title if there had been a valid delivery to it. Toyomenka, the owner, never made or authorized such delivery, and, if it be asserted the negligent act of billing by Wilmington may be deemed to constitute delivery, it is sufficient answer that an unauthorized act by the bailee cannot bind Toyomenka or operate to forfeit its property rights. See Sink v. Sechrest, *supra*. The cases cited by Mount Hope in support of this phase of its argument involved instances in which undisputed delivery had been made to the buyer. In those situations, where there has been "delivery to the buyer", a reservation of title by the seller, by express provision of the Code, is "limited in effect to a reservation of a security interest". Section 2–401(1); Brandywine Lanes, Inc. v. Pittsburgh Nat. Bank (Pa.1970) 261 A.2d 330, 333; Evans Products Company v. Jorgensen, *supra*. This is not such a case. It is manifest, therefore, that the provisions of the Uniform Commercial Code, relied on by Mount Hope, were inapplicable and, under circumstances where an entrustment does not qualify under Section 2–403(2), pre-code law will be applicable "in determining the rights of the parties". See 21 Fla. L.Rev. 241, at p. 247.

 It was conceded by all parties that the relationship between Toyomenka and Wilmington was that of

---

11. It seems settled that matters arising in connection with the performance of a contract are governed by the law of the place of performance. Keco Industries, Inc. v. ACF Industries, Incorporated (4th Cir. 1963) 316 F.2d 513, 514; Arditi v. Dubitzky (2nd Cir. 1965) 354 F.2d 483, 485–6; Wm. J. Lemp Brewing Co. v. Ems Brewing Co. (7th Cir. 1947) 164 F.2d 290, 293–294, cert. denied 333 U.S. 863, 68 S.Ct. 745, 92 L.Ed. 1142.

12. See Evans Products Company v. Jorgensen (1966) 245 Or. 362, 421 P.2d 978, 983, where the defendant had received the products in satisfaction of a debt. The Court found the transaction not to qualify under Section 403(2) of the Uniform Commercial Code because "this was not a sale in the ordinary course of business".

bailor and bailee.[13] The District Court, without objection, so charged the jury. As bailee, the authority of Wilmington was limited strictly by the terms of the agreement whereby it obtained possession of the bailor's property. Trailer Leasing Co. v. Scrappo (1968) 97 Ill. App.2d 465, 240 N.E.2d 204, 206. Except as authorized by its instructions, it had no authority to sell, transfer or give away the goods of its bailor, Toyomenka. Nor can any negligent act or error of the bailee (Wilmington) be imputed to the bailor (Toyomenka).[14] In the absence of grounds for an estoppel and except as provided in Sections 2–403(2) or 2–401 of the Uniform Commercial Code, as adopted by North Carolina, "No right, title, or interest may be acquired as the result of an unauthorized or wrongful sale, gift, exchange, pledge, mortgage, or other transfer of property by a bailee in possession, even though to an innocent purchaser. The bailor is not divested of his title by such an unauthorized act and may recover the property or its value from the vendee or transferee in any appropriate form of action." 8 Am.Juris.2d, p. 987; Whitford v. Lane (1925) 190 N.C. 343, 130 S.E. 36, 39; Petzoldt v. Lawrence Warehouse Company (D.C.Colo.1957) 157 F. Supp. 184, 188, aff. First Nat. Bank of Fleming, Colo. v. Petzoldt, 262 F.2d 540. Sections 2–403(2) and 2–401 are inapplicable, as we have seen, and Mount Hope's defense must, therefore, rest on estoppel. To create an estoppel against

bailor, the bailor (Toyomenka) itself, however, must have done more than entrust possession to its bailee,[15] it must have done something to mislead the transferee (Mount Hope) to the latter's prejudice. King Homes, Inc. v. Bryson (1968) 273 N.C. 84, 159 S.E.2d 329, 333–334; Hawkins v. M & J Finance Corp. (1953) 238 N.C. 174, 77 S.E.2d 669, 672 and 676; American Exchange Nat. Bank v. Winder (1929) 198 N.C. 18, 150 S.E. 489, 491. Toyomenka did nothing itself to mislead Mount Hope and, as has been observed, the act of negligence by Wilmington cannot be imputed to it. Whitford v. Lane, supra. Nor did Mount Hope take any action in reliance on anything Toyomenka did to its prejudice. As the Court said in Milner v. Ingram & Le Grand Lumber Co. (1952) 86 Ga.App. 543, 71 S.E.2d 786, 788, "A recovery by the plaintiff here will not injure the defendant, but will only place it in the same position it maintained before the delivery of the timber, that of the agent's creditor." What is being denied Mount Hope by the judgment herein is a "windfall" at the expense of the plaintiff and Wilmington.

The appellant, also urged, on its motion for judgment n. o. v. that the verdict over in favor of Wilmington against it was equivalent to a finding "that Mount Hope had not converted the goods in question" and thereby operated to absolve it of liability and as a verdict in its favor. This argument overlooks the

13. See Earhart v. Callan (9th Cir. 1955) 221 F.2d 160, 163: "A bailment is generally regarded as the relationship arising when personal property is delivered to another for some particular purpose upon an express or implied contract to re-deliver the goods when the purpose had been fulfilled or to otherwise deal with the goods according to the bailor's directions."

14. Sink v. Sechrest, supra; Williamson v. Varner, supra; see, 65A C.J.S. Negligence § 161, p. 206.

15. See Mori v. Chicago Nat. Bank (1954) 3 Ill.App.2d 49, 120 N.E.2d 567, 569:
 "Nonetheless, although mere posses-

sion be delivered by a manufacturer, wholesaler, or other conditional vendor, mortgagee, lienor or general creditor to a retail dealer, because delivered for the apparent purpose of resale, a condition that title shall remain in the seller until the price is paid, or that the chattels are to be used as samples only, is ineffectual as against a bona fide purchaser from the retailer. * * *
 "However, this doctrine is viewed differently where the initial transaction is not one of sale but of consignment, bailment or agency for a special purpose which is not accompanied by any authority to sell, implied or express, or other indicia of title beyond possession."

terms on which the District Court, in its charge, instructed the jury it might return a verdict over against Mount Hope. The District Court specifically instructed the jury that a verdict on Wilmington's cross-complaint required that it find that Wilmington had sustained the burden of proof "to satisfy you by the evidence that Mount Hope wrongfully sold and converted said goods to its own use". The verdict over thus did not absolve Mount Hope of conversion; it represented, on the contrary, a finding of conversion on the part of Mount Hope and a judgment against it followed.

■ As stated, Mount Hope, by its appeal, attacks, too, the sufficiency of the District Court's instructions on the nature and extent of its lien, on the authority of which it purported to sell the goods. Since, as we have seen, any such lien, if it existed, could not divest Toyomenka of its right of ownership, any failure of the Court to instruct fully with reference to Mount Hope's rights under its alleged lien was harmless.

Finally, Mount Hope raises certain objections to admissions of evidence. The admissions fell within the range of the Trial Court's discretion and such discretion will not be disturbed.

Affirmed.