**DANIEL CONSTRUCTION COMPANY, Inc., Plaintiff,**

v.

**WELCH CONTRACTING CORPORATION, Defendant.**

**Civ. A. No. 31–70–N.**

United States District Court,
E. D. Virginia,
Norfolk Division.

Dec. 21, 1971.

Joseph A. Gawrys, Norfolk, Va., for plaintiff.

Jack E. Greer, Norfolk, Va., for defendant.

### MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

This is an action brought by Daniel Construction Company, Inc., hereinafter referred to as Daniel, wherein Daniel seeks to be indemnified and saved harmless and exonerated by the defendant, Welch Contracting Corporation, for all property damage arising out of the work undertaken by said defendant.

Plaintiff, Daniel, is a general contractor. Plaintiff entered into a contract dated November 5, 1968, with the Chesapeake and Potomac Telephone Company of Virginia to perform certain foundation work in the construction of a new Bell Telephone Building in Norfolk,

Virginia.[1] Subsequent to this contract with Chesapeake and Potomac, plaintiff entered into a subcontract with Welch Contracting Corporation (then called Welch Pile Driving Corporation and hereinafter referred to as Welch). The subcontract,[2] drafted by Daniel, called for Welch to perform the job requirements for demolition, excavation and backfill, driving of sheeting only and piling work complete, with certain other contractual provisions contained therein.

On or about May 20, 1969, heavy rain caused flooding on Boush Street adjacent to the work site. At some point during this time, there was a break in the city water main on Boush Street. Water flooded parts of the excavated site, and accumulated behind the sheeting, thereby causing a cave-in of portions of Boush Street, and a number of the sheet pilings along Boush Street collapsed and were pushed out of alignment. On September 9, 1969, a crack developed in York Street, and there was some movement of the sheet pilings adjacent to York Street. Plaintiff filed suit alleging that Daniel is entitled to be indemnified and saved harmless and exonerated by the defendant Welch pursuant to the indemnity agreement provision of the subcontract between plaintiff and defendant, for the substantial expenses incurred in correcting and repairing the property damage.

## I.

The threshold question is whether Welch should be required to indemnify Daniel for the property damage and subsequent expenses incurred by Daniel. The subcontract between Daniel and Welch contains an indemnity agreement providing:

> "Section 8. The Subcontractor covenants to indemnify and save harmless and exonerate the Contractor and the Owner of and from all liability, claims and demands for bodily injury and property damage arising out of the work undertaken by the Subcontractor, its employees, agents or its subcontractors, *and arising out of any other operation no matter by whom performed for and on behalf of the subcontractor, whether or not due in whole or in part to conditions, acts or omissions done or permitted by the Contractor or Owner."* (Emphasis added.)

Plaintiff Daniel contends that the indemnity agreement expressly and unequivocally provides for indemnification despite any negligence on its own part. Daniel relies on United States v. Seckinger, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed. 2d 224 (1970), reh. denied 397 U.S. 1031, 90 S.Ct. 1255, 25 L.Ed.2d 546 (1970), as clearly supporting the proposition that a party may be indemnified against its own negligence, if the indemnity agreement so provides. In United States v. Seckinger, a case requiring the application of federal law as the contract was a fixed-price government construction contract, the Supreme Court granted no recovery to the indemnitee of

1. Article 1 of the contractual agreement reads:
   "The Contractor shall furnish all of the materials and perform all of the work shown on the Drawings and described in the Specifications entitled 'Foundation Work, Bell Telephone Building (Section "G"), Bute Street, Norfolk, Virginia; prepared by Lee, King, and Poole, Architects, Richmond, Virginia, and Oliver and Smith, Associated Architects, Norfolk, Virginia, acting as and in these contract documents entitled the 'Architect,' and shall do everything required by this Agreement, the General Conditions of the Contract, the Specifications and the Drawings."

2. Section 1 of the subcontract provides as follows:
   "The Subcontractor agrees to furnish all labor, materials, equipment and incidentals * * * and fully perform and in every respect complete the following work: Job requirements for demolition, excavation and backfill, driving of sheeting only, and piling work complete, in accordance with plans and specifications prepared for the project by Lee, King and Poole, with Oliver and Smith Associates, their Commission No. 637–A, and specifically described in Division 3 entitled 'Demolition;' Division 4 entitled 'Excavation;' and Division 5 entitled 'Piling.'"

a subcontractual agreement, since it found that the contract did not unequivocally command that the government be indemnified for its own negligence. Indeed, there is much support for the principle that a contractual provision should not be construed to permit an indemnitee to recover for his own negligence, unless the court is firmly convinced that such an interpretation reflects the intention of the parties. Eastern Gas and Fuel Associates v. Midwest-Raleigh, Inc., 374 F.2d 451 (4 Cir., 1967). Yet Justice Brennan stated in *Seckinger* that such an indemnity agreement need not include an "indemnity and hold harmless" clause. *Cf.* United States v. Hollis, 424 F.2d 188 (4 Cir., 1970).

We must apply Virginia law and not federal law in resolving the issue at hand. Several recent cases have clearly indicated that it is appropriate that state law should be controlling in such matters. In Keco Industries, Inc. v. ACF Industries, Incorporated, 316 F.2d 513, 514 (4 Cir., 1963), the Fourth Circuit held that matters arising in connection with the performance of a contract are governed by the law of the place of performance. This exact ruling was recently adopted in Toyomenka, Inc. v. Mount Hope Finishing Company, 432 F.2d 722 (4 Cir., 1970).[3]

In National Motels, Inc. v. Howard Johnson, Inc. of Wash., 373 F.2d 375, 379 (4 Cir., 1967), the court held that it is apparently not against the public policy of Virginia for one to contract against one's own negligence. *See:* Lackey v. Brooks, 204 Va. 428, 132 S.E.2d 461 (1963). Yet the court noted that Virginia law demands strict interpretation of contracts, and it will not allow such indemnity agreements to be read into a contract. The majority view in Virginia would appear to suggest that "the Court should be most reluctant to construe a contract indemnifying a party against its own negligence *unless the*

*terms are clear and explicit.*" United States v. Newport News Shipbuilding & D. D. Co., 130 F.Supp. 159 (E.D.Va., 1955), affirmed 226 F.2d 137 (4 Cir., 1955).

In W. F. Magann Corporation v. Virginia-Carolina Electrical Works, Inc., 203 Va. 259, 123 S.E.2d 377, 381 (1962), Justice Buchanan stated that the guiding light in construction of a contract is the "intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." Plaintiff maintains that the last phrase of the indemnity clause reading "whether or not due in whole or in part to conditions, acts or omissions done or permitted by the Contractor or Owner" fixes liability on Welch even though the failure might be due in whole or in part to Daniel's acts or omissions. Yet one must read the indemnity provision in its entirety to fully understand its real significance. The clause also contains the language "arising out of the work undertaken by the Subcontractor, its employees, agents or its subcontractors, and arising out of any other operation no matter by whom performed *for and on behalf of the Subcontractor.*" (Emphasis added.) Thus, it would appear that the reference to Daniel's acts or omissions must be tied into either work done by Welch under the contract or work done *for* Welch. To allow plaintiff to recover otherwise would not be indemnity but would amount to an assumption by Welch of responsibility for the whole job. It is clear that the Virginia law does not provide for such an interpretation of indemnity as indemnity does not include any and all liability without reference to cause or the indemnitor's work. W. F. Magann Corporation v. Virginia-Carolina Electrical Works, Inc., supra; Seaboard Air L. R. Co. v. Richmond-Peters-

3. This principle is derived from the landmark case of Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), which established that state law is controlling in matters of this nature. See: Black Warrior Electric Membership Corp. v. Mississippi Power Company, 413 F.2d 1221 (5 Cir., 1969).

burg Turnpike Authority, 202 Va. 1029, 121 S.E.2d 499 (1961).

## II.

Having decided that the indemnity clause will be binding on defendant Welch only if the claim arose out of Welch's work, or some work done for Welch, even though Daniel may have participated therein, there remains the issue of the cause of the loss and damage to the project. We concern ourselves initially with the collapse and shifting of the piling along Boush Street.

The subcontractor, Welch, was required to do demolition, excavation and backfill, driving of sheeting only, and piling work complete as described in the plans and specifications for foundation work prepared for the project by Lee, King and Poole along with Oliver and Smith Associates. The prime contract between Daniel and The Chesapeake and Potomac Telephone Company of Virginia provided that Daniel should supervise and direct the work and "be solely responsible for all construction means, methods, techniques, sequences and procedures." In accord with this provision, Daniel's contract with Welch specifically provided that Welch's work was to be performed when and as required by Daniel's job superintendent and, in general, would be in accordance with the dates as shown on a Critical Path Schedule for the project.

The subcontract provided that Daniel was to furnish the sheet piling, and it was to furnish "necessary reinforcing for cast-in-place piles." In accord with this provision and the provision of Daniel determining the sequence of the work, Daniel "worked closely" with Thomas Hanson & Associates for a design of a foundation shoring plan. The shoring plan called for various lengths of sheet piling to be driven around the perimeter of the site with a system of walers and rakers for bracing purposes eventually to be installed. In essence,

this sequence of procedure provided for excavation to, and extraction of, the existing piles, driving of perimeter sheeting pile, excavating down to a +5.71 foot level, driving piles in the +5.71 foot area, excavating in bowl-shaped street sides down to a −15.62 foot area, driving piles in the −15.62 area, casting a concrete mat in the −15.62 foot area, driving piles in the area immediately around the −15.62 foot mat, installing walers and rakers around the perimeter, excavating down to the remaining required elevations, and driving the remaining piles. The concept involved was that the soil or earth berm would act as shoring or bracing until the specified bracing against the mat was installed. The sheeting was not designed to retain the cut without shoring and bracing, and the design requirement, including bracing, was for the earth to be dewatered by wellpoints as it was not designed for a full hydrostatic pressure. The subcontract with Welch specifically provided that Daniel was responsible for furnishing a dewatering system to remove natural ground water.

The work commenced in November 1968 with the demolition of the old foundation and extraction of the old piles. The driving of the sheeting began the end of January 1969 and continued through March 1969. Thereafter, excavation work and driving of production piles was done in accordance with the direction of Daniel as to excavation levels and the layout of production piles.[4] It is important to note that prior to the commencement of the work, Daniel elected to change the sequence of the work as set out in the Hanson design, in that instead of excavating only to the +5 foot level and driving production piles along the existing building there, the sequence was changed to excavate and drive piles along Bute Street and York Street, which meant excavating to the −7 foot level, all before excavating the deep hole, pouring the slab, and putting in the walers and rakers.

---

4. It should be noted that the "production piles" are the concrete or weight-bearing piles, as distinguished from the sheet piling, also called sheeting.

The determination of the sequence of the work, the engineering of the elevation of excavation, the decision as to what area was to be excavated and the laying out of the pile driving work were all determined by and directed by Daniel. Plaintiff's argument is that the "thread going through all the case" is that the design called for the earth berm to stay in place until the concrete pad was poured and the rakers installed and, therefore, the excavation by Welch is work out of which the failure arose. Yet this contention is not supported by the facts in two significant respects.

First of all, the design did not call for the earth berm simply to remain but, instead, it called for a sequence to be established by Daniel by which adequate shoring and bracing would be placed by Daniel prior to Daniel's directing the removal of any berm. Secondly, the establishment of grade, which called for any excavation, both as to the sequences, location, and depth, was the sole responsibility of Daniel. The foundation shoring is the complete system, including the sheeting and length thereof, the shoring and bracing, inclusive of the earth shoring, and the sequence of construction, including when certain levels should be excavated and, concomitantly, the placing of bracing required before or at the time of the removal of any earth. It is provided for expressly in the agreement between Daniel and Welch that the responsibility for the shoring and bracing was Daniel's.

Daniel worked closely with Thomas Hanson & Associates for the design of the foundation shoring and bracing plan, and accordingly a procedure was devised which was considered to be an economical approach. One aspect of the design was to use shorter sheeting than a length that would have been required for the sheeting to act as a cantilever, or in other words, to be more nearly self-sustaining. As a result, shoring and bracing were necessary as the sheeting was not designed to hold up without it. The Court is persuaded by Hanson's

testimony that not only was the bracing mandatory but that it was contemplated that rakers would be installed before the earth berm was removed, and it would most certainly make a difference if not done in this prescribed manner. It is also significant to note that after the damage to the work site had occurred on May 20, Daniel thereafter installed a horizontal or checkerboard system of bracing all the way across the excavation. This design of bracing had originally been recommended by consulting engineer, Abiouness, to Daniel on or about May 2, 1969, yet this recommendation and others were simply not followed by Daniel.

Daniel relies heavily on the fact that Welch excavated certain areas. Yet the excavation was called for not as a part of Welch's work, but as a part of Daniel's in its responsibility to put in the bracing. It was clearly indicated in the course of the trial that Daniel was to engineer or lay out the excavation of earth, which was to be followed by the pile driving. This work included the determination of the sequence of the excavation, grades and staking of the piles.

In regard to the York Street movement, Daniel maintained that this damage was attributed to excessive excavation by Welch. The plaintiff stated that the earth berm was excavated to a depth of eleven feet below what it should have been. Yet it must be remembered that the determination of grades and design was Daniel's responsibility, and that it was incumbent upon Daniel to adequately shore and brace the sheeting which it failed to do.

Plaintiff cites Davis Constructors & Eng., Inc. v. Hartford Acc. and Ind. Co., 308 F.Supp. 792 (M.D.Ala., 1968), in which the court allowed indemnity under an indemnity clause, which is identical to the one in the case at bar. The plaintiff in that case was the general contractor for the construction of a mill, who had subcontracted the masonry work. An employee of the subcontractor was injured when scaffolding, which the

plaintiff had erected for the subcontractor, fell. Davis, the contractor, brought a declaratory judgment action under the direct action statute of Alabama against the insurer of the subcontractor seeking indemnity for any recovery that might be had against it in a state court action by an employee of the subcontractor. The court allowed indemnity holding that the additional words providing for indemnity *whether or not due to the acts of the contractor* would be sufficiently broad to cover acts of negligence by the contractor. Yet it should be noted that Alabama law provides for a broad interpretation of such indemnity agreements as distinguished from Virginia's rule of strict interpretation. Furthermore, the factual situation is quite different for, in the *Davis* case, the indemnitee erected the scaffold "for and on behalf of the subcontractor," which would bring it within the clause, whereas Daniel, in the present case, did not design and erect the shoring and bracing for and on behalf of Welch.

■ Daniel's claim is not a situation where the contractor was unaware of certain work being done by a subcontractor, or even simply allowed such work to be done. Instead it is clearly indicated that the work in question was under the actual direction and control of Daniel. Plaintiff's contention is not that Welch should indemnify Daniel for claims resulting from or because of Welch's work, but that Welch in effect, simply because his work was involved on the job, must assume responsibility for any failure in the design, for the work in the shoring and bracing of the retaining wall and for the success or failure of any corrective measures which Daniel might have elected or not have elected to take. It is clear that Virginia law does not provide for such an interpretation of indemnity as indemnity should not include any and all liability without reference to cause. Surely, such a result from an indemnity clause as worded here would prove contrary to the intent of the parties involved in the construction contract, bearing in mind that Dan-

iel drafted the contract. Hence, the loss must be suffered by Daniel alone.

A judgment order may be presented in accordance with the views expressed herein.